MURRAY ᴇᴛ ᴜx. *v.* FISHMAN CONSTRUCTION
COMPANY, INC.

[No. 155, September Term, 1965.]

*Decided March 4, 1966.*

*Motion to clarify opinion filed March 24, 1966, denied March 29, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, MARBURY, OPPENHEIMER and McWILLIAMS, JJ.

*John P. Moore*, with whom were *Wheeler, Moore & Korpeck* on the brief, for the appellants.

*Martin J. Kirsch* for the appellee.

McWILLIAMS, J., delivered the opinion of the Court.

On 3 July 1963 the appellee (Fishman) agreed in writing (A.I.A. short form) to build for the appellants (Murray) a house, according to plans and specifications attached to the agreement (contract), and Murray agreed to pay therefor $25,-400. On 27 November, Murray was advised by his bank, Suburban Trust Company, that the agreed disbursements to Fishman had been suspended because "the building * * * [was]

not being constructed according to [the] plans and specifications."

Shortly thereafter Murray engaged as his attorney, Mr. John P. Moore of the Montgomery County bar. Efforts on the part of Murray and Mr. Moore to arrive at a satisfactory adjustment of the ensuing dispute having come to naught, by a letter dated 25 February 1964 Murray availed himself of the provisions of Article 10 of the agreement giving him the right to terminate. Fishman thereupon employed Mr. Charles W. Bell of the Montgomery County bar, who, on 16 March, advised Mr. Moore that he had docketed a mechanic's lien on behalf of his client. (The details of the lien are not in the record.) Mr. Bell expressed the hope that the matter could be "worked out short of litigation." His concluding paragraph is set forth in full:

> "I intend to follow the matter of the lien up with a law suit against Mr. and Mrs. Murray but will withhold the filing of same until *you* have had a chance to receive an answer to this letter. I realize that you are probably 'up to your neck' and would like you to know that *I do not intend to push you as far as time is concerned.*
>
> "Best of luck." (Emphasis supplied.)

The phrase "up to your neck" is a recognition of the fact that Mr. Moore was campaigning for a seat in the 89th Congress and election day (19 May) was not far off.

Responding to the letter, Mr. Moore telephoned Mr. Bell and suggested that the matter of compromise might better be explored upon completion of the house, as the total cost to Murray could not sooner be ascertained. We are under the impression this was agreeable to Mr. Bell.

Mr. Bell filed the law suit on 29 April. The declaration is a printed form on which inappropriate matter has been crossed out and which, as completed, is as follows:

> "For work completed and materials incorporated into job located on Lot 28, Block 5, North Glenhills, Cleveland Drive, Montgomery County, Maryland, as of January 15, 1964.

"And for money payable by the Defendants to the Plaintiff:

"* * *[F]or work done and materials provided by the Plaintiff for the Defendants at their request:

"And for money found to be due from the Defendants to the Plaintiff on accounts stated between them:

"And the Plaintiff claims therefor the sum of $6815.37."

Attached to the declaration was one of Fishman's billheads on which was written:

"Work completed and materials incorporated into job located on Lot 28, Block 5, North Glenhills, Cleveland Drive, Montgomery County, Maryland, as of January 15, 1964.

| | |
|---|---:|
| Actual direct cost | $11,197.92 |
| 15% overhead | 1,679.69 |
| | $12,877.61 |
| 10% anticipated profit | 1,287.76 |
| | $14,165.37 |
| Less payments on account | 7,350.00 |
| Balance Due | $ 6,815.37" |

Filed with the declaration was a motion for summary judgment. The accompanying affidavit (which is undated), made by Sydney Fishman, president, recites that Murray is indebted in the full sum of $6815.37 "over and above all discounts, being the amount due as shown on the Bill of Particulars annexed hereto [the billhead] * * * and that there are no set-offs, counter claims or just grounds of defense * * *."

Service on Murray was accomplished on 27 May and early in June the papers were delivered to Mr. Moore. He entered his appearance on 17 June. He said he intended to "file a plea, set-off and a counter claim" later on after the house was finished and Murray could give him the details of the final cost. On 22 July an amended military affidavit was filed by Mr. Bell and on the same day Judge Shook passed an order (sub-

mitted by Mr. Bell) reciting that the defendants had "failed to plead or *otherwise enter their appearance herein by counsel*," granting the motion, and entering judgment for $6815.37. (Emphasis supplied.) Mr. Moore had no knowledge of the entry of the judgment until 14 September when he saw a letter from Mr. Bell, which reads as follows:

"Dear John:

"With regard to the above entitled matter, this is to inform you that it was not discovered by this office that your appearance was in the case for the Defendants until yesterday. Default judgment in this matter was entered in mid July, and this is to inform you that I have written directly to the Murrays requesting payment of the judgment.

"I don't know whether the Murrays are your clients or will come to you upon receipt of this letter, but thought that I had better put you on notice of the above."

It was indicated at argument that, after the receipt of the letter, Mr. Moore suggested to Mr. Bell that he consent to the vacation of the judgment but that, although Mr. Bell was agreeable, Fishman would not allow it. Mr. Bell thereupon withdrew from the case.

On the following day the motion to vacate was filed citing the irregularity of the affidavit and its inherent fraudulence. The motion was supported by the affidavit of Mr. Moore to which was attached copies of correspondance between Murray and Fishman and between Mr. Moore and Mr. Bell. The order to show cause was answered by Fishman's new attorney.

Just prior to the hearing before Judge Shook on 16 October, Mr. Moore filed the affidavit of Murray to which was attached as an exhibit a copy of the agreement between Fishman and Murray. This hearing never rose above the level of an extended colloquy between the court and counsel at the conclusion of which the court said:

"I think this is a case that perhaps should be set down for hearing to see, on testimony of the parties to determine, whether or not it should be vacated. I think

that I will ask the Assignment Office to set it down, and you will have to come in with your clients."

Winter had given place to spring before the parties and their attorneys again appeared before Judge Shook. Also present, in response to subpoenas, were John T. Sherwood of Suburban Trust Company and Mr. Bell. It is unnecessary to recount the colloquy which took place on this occasion (10 May) except to note that it was much longer. Judge Shook refused to allow the production of any testimony or other evidence. Her concluding remark was:

> "* * * I must find as a matter of law that they [Murray] have not alleged and *proved* the matters that are required to be alleged and proven to substantiate the granting of your [Murray's] motion to vacate the judgment." (Emphasis added.)

An order to the same effect was filed a week later and from that order this appeal was taken.

Fishman argued before us, as he argued before Judge Shook, that the "fraud necessary to set aside an enrolled judgment must be such a fraud that it prevented the other party from responding to the action." He says, in effect, even if the affidavit did contain deliberate and material falsehoods, even if it did deceive the court, even if it did recite a cause of action which he knew did not exist, Murray was not prevented thereby from filing an appropriate and timely defense. In support of this proposition he cited, both to us and to Judge Shook, *Toledo Scale Co. v. Computing Scale Co.,* 261 U. S. 399, 421, 43 Sup. Ct. 458, 67 L. Ed. 719 (1923), wherein Chief Justice Taft said:

> "* * * [T]o justify setting aside a decree for fraud whether extrinsic or intrinsic, it must appear that the fraud charged really prevented the party complaining from making a full and fair defense."

The decree sought to be reopened (in *Toledo*) had been entered by the District Court in 1913 (10 years earlier) after litigation which had begun in 1907 and which had been conducted by a number of able and well-known lawyers. Whether the language of Chief Justice Taft has any applicability to the quite

different situation before us is something with which, in the case at bar, we need not concern ourselves. Maryland Rule 625 a [1] controls the instant case and although it has been mentioned, discussed or construed in many of our decisions we have never narrowed its scope to the extent claimed by Fishman.[2]

Even if support for Fishman's contention could be found in the decisions of this Court, testimony produced at a hearing might disclose a nexus between the alleged fraud in obtaining the judgment and Mr. Bell's arrangements with Mr. Moore sufficient to render his contention inapplicable. Mr. Bell was his attorney of record and what he did in the conduct of the case must be considered as done by, and binding upon, his client. *Thomas v. Hopkins,* 209 Md. 321, 121 A. 2d 192 (1956).

We think the trial judge should have heard testimony relating to the delay in filing the motion to vacate the judgment and the alleged fraud, mistake or irregularity in its obtention. In *Thomas, supra,* we said:

> *"Normally a court would hear evidence* on a charge of fraud and deceit, * * *. We find, however, from a close examination of the record and from concessions made in the brief of the appellants and at the argument that the trial judge reached the right result in denying the motion to strike, *despite his unusual refusal to hear the testimony the appellants desired to offer." Id* at 324-25. (Emphasis supplied.)

There was already before Judge Shook enough of the indicia of fraud to require the exercise of the court's *quasi*-equitable

---

1. "For a period of thirty days after the entry of a judgment, or thereafter pursuant to motion filed within such period, the court shall have revisory power and control over such judgment. After the expiration of such period the court shall have revisory power and control over such judgment, only in case of fraud, mistake or irregularity."

2. See, *e.g., Suburban Mgmt. v. Johnson,* 236 Md. 455, 204 A. 2d 326 (1964); *Mason v. Central Oil Burner,* 227 Md. 380, 177 A. 2d 415 (1962); *Cramer, Trustees v. Wildwood Co.,* 227 Md. 102, 175 A. 2d 750 (1961); *Tasea Investment Corp. v. Dale,* 222 Md. 474, 160 A. 2d 920 (1960); *Williams v. Snyder Adm'r,* 221 Md. 262, 155 A. 2d 904 (1959).

power to consider all of the facts and circumstances so that the ends of justice would be subserved. *Brothers v. Tilken,* 236 Md. 267, 203 A. 2d 702 (1964) ; *Crawford v. Richards,* 193 Md. 236, 66 A. 2d 483 (1949) ; *Harvey v. Slacum,* 181 Md. 206, 29 A. 2d 276 (1942) ; *Craig v. Wroth,* 47 Md. 281 (1877). Mr. Moore had stressed at the October "hearing" and again at the May "hearing" that the rights of the parties were controlled by the agreement, which was before the court; that there was nothing in the agreement authorizing 15% overhead or 10% profit; that there was nothing in the agreement authorizing labor and materials to be charged at cost; that Fishman's claim, if he had any at all, had to be founded in Article 10 [3] of the contract; that the affidavit made no mention of the agreement; that the affidavit was undated; that there were no "accounts stated between them."

In the affidavit of Murray (filed 16 October) there was information which, if true, indicated that instead of being owed $6815.37 (the amount of the judgment) by Murray, Fishman actually owed Murray $4,950. Murray claims he had to pay out $23,000 to finish the house. He had already paid Fishman $7,350 which, if subtracted from the contract price of $25,400, leaves $18,050, the maximum net balance due Fishman. Under Article 10 of the agreement Fishman would owe Murray the difference between $23,000 (the cost of finishing the house) and $18,050, or $4,950.

An inspection of the court file would also have disclosed that Mr. Moore's appearance was entered on 17 June and that

3. "ARTICLE 10—OWNER'S RIGHT TO TERMINATE THE CONTRACT

"Should the Contractor neglect to prosecute the work properly, or fail to perform any provision of the contract, the Owner, after seven days' written notice to the Contractor, and his surety if any may, without prejudice to any other remedy he may have, make good the deficiencies and may deduct the cost thereof from the payment then or thereafter due the contractor or, at his option, may terminate the contract and take possession of all materials, tools, and appliances and finish the work by such means as he sees fit, and if the unpaid balance of the contract price exceeds the expense of finishing the work, such excess shall be paid to the Contractor, but if such expense exceeds such unpaid balance, the Contractor shall pay the difference to the Owner."

the order of 22 July prepared by Mr. Bell incorrectly recited that the defendants had failed to "enter their appearance herein by counsel."

Mr. Moore was aware that who will owe whom how much was not possible of determination until after Murray finished the house; indeed, this was the gist of the telephone conversation between him and Mr. Bell following the receipt of Mr. Bell's letter of 16 March 1964. Even after Murray delivered the suit papers to him in June there was no particular reason for him to be concerned. This was the suit Mr. Bell said he intended to file. He had entered his appearance in the action, he had Mr. Bell's assurance (in writing) that he did not "intend to push * * * [him] as far as time * * * [was] concerned," he had an understanding that settlement discussions would await the completion of the house, and he knew, of course, that Fishman would have no figures which could support a valid claim until the house was finished and he intended at that time to file a defensive pleading and a counter claim. He certainly had no reason to expect, or suspect, that Mr. Bell (a friend and colleague), under the circumstances and without warning, would obtain a default judgment against his client. He had even less reason to expect, or suspect, that, having obtained such a judgment, Mr. Bell would wait six weeks to tell him about it. Of course, Mr. Bell says it was not until then that the fact of Mr. Moore's appearance was discovered. Although the record does not tell us much about the subsequent conversation between Mr. Moore and Mr. Bell, it was indicated, as we have hereinbefore noted, that Mr. Bell, had he been allowed to testify, would have said he would not have taken the judgment had he known Mr. Moore's appearance had been entered, that he was agreeable to vacating the judgment, but that Fishman would not allow it.

Fishman insists that even if his affidavit is fraudulent this is not a sufficient ground to set aside the judgment and in support of this proposition he cites two decisions of this Court, *Adelberg v. Stryjewski*, 200 Md. 346, 89 A. 2d 592 (1952) and *Thomas v. Hopkins, supra.*

We have no difficulty distinguishing *Adelberg* from the case at bar. In that case the *only* reasons set forth in the motion

and affidavit were that the defendant was not indebted as alleged, that the vouchers were fraudulent and that the accounts stated were untrue. The essence of the Court's decision is succinctly and accurately expressed by Judge Collins, who wrote the opinion:

> "In the instant case there is no proof of any of those essentials, as herein before stated, necessary to strike out this enrolled judgment. In fact there is no allegation of any of these essentials except that of fraud. There are no facts alleged to constitute that fraud, the allegation being merely 'that the vouchers attached to the said declaration are fraudulent'. * * * [That] is merely a conclusion of the pleader." (Citing cases.) *Id* at 350.

*Thomas* presents an involved and somewhat unusual factual situation only remotely resembling the instant case. The parties in that case either litigated or were given an opportunity to litigate all of the issues and it was conceded that the only question before the Court arose out of the erasure of certain credits on the back of the promissory note. The Court did not indicate that the erasure was fraudulent; indeed, a perfectly legitimate reason for making it was suggested by the Court. We do not find in *Thomas* any support for the proposition put forward by Fishman.

Since both parties, to some extent, rely on *Tasea Investment Corp. v. Dale*, 222 Md. 474, 160 A. 2d 920 (1960), we think some comment is required. Tasea sued Mrs. Dale for damages arising out of a collision between two automobiles. She sent the suit papers to her insurance company and, believing her interests were being looked after, did nothing further. The insurance company inadvertently neglected to defend the suit and in due course Tasea obtained a judgment. The motion to strike, filed after enrollment, alleged only surprise and mistake but stated no facts in support thereof. It was admitted that the judgment was not fraudulently or irregularly obtained. The Court held it was not enough, under the circumstances, that she acted in good faith and with ordinary diligence and that she had a meritorious defense. Judge Horney, for the Court, discussed the

nature of the power of courts to vacate enrolled judgments and indicated what is required to induce the exercise of that power:

> "The power to set aside a judgment upon motion has been variously described as a power 'incident to all courts of record,' as a power based on 'equitable grounds' and as the exercise of a *quasi* equitable power.' See, for example, *Kemp v. Cook,* 18 Md. 130 (1861) ; *Dorsey v. Gary,* 37 Md. 64 (1872) ; and *Waters v. Engle,* 53 Md. 179 (1880). In the cases, the grounds upon which final judgments have been set aside after enrollment are stated to be fraud, deceit, mistake, surprise and irregularity. In the present rule, as consolidated and simplified, the only grounds specified are fraud, mistake and irregularity[.] * * *"
> *Id* at 478
>
> * * *
>
> "But in all such cases, the court, in addition to requiring the party who moves to set aside an enrolled judgment to show by satisfactory proof that he is acting in good faith, with ordinary diligence, and that he has a meritorious defense or cause of action, as the case may be, should also require a showing of such facts and circumstances as will certainly establish the fraud, mistake or irregularity allegedly resorted to in obtaining the judgment sought to be vacated." (Citing cases.) *Id* at 479.

In *Mason v. Central Oil Burner,* 227 Md. 380, 177 A. 2d 415 (1962) the trial judge denied a motion to vacate a judgment of more than four years' standing. In reversing the trial judge, Judge Marbury, for the Court, had this to say:

> "Upon the facts disclosed by the record we think the actions of the learned trial judge were clearly erroneous in not vacating the judgment and permitting testimony on the merits * * * [.]
> "We think the appellant made out a proper case for relief under Maryland Rule 625 * * * [.]
> "Obviously the appellee was entitled to have but one satisfaction of a judgment upon a single obligation. It

may be that the appellee itself was uncertain as to the identity of the debtor when it filed the successive suits upon the contract within the period of approximately a month. However, submitting the two cases for summary judgment in the letters from appellee's counsel dated January 3 and February 13, 1957, for different amounts *tended to mislead the judge who, on March 6, 1957, in each case, ordered the entry of the summary judgment. This amounted to a fraud upon the court. Regardless of whether the action of appellee's counsel was intentional or by inadvertence, the result is the same, and clearly brings the case within the fraud exception of Rule 625.* * * *" *Id* at 384. (Emphasis supplied.)

If the judge was misled in *Mason* it is more than likely Judge Shook was misled in the case at bar. The matter of Mr. Moore's appearance has already been mentioned. The inclusion of the "accounts stated between them" count[4] in the declaration surely operated to obscure the fact that Fishman's claim was *not liquidated.* Any mention of an agreement between the parties might very well have directed the court's attention to the propriety of the "10% *anticipated* profit" or the "15% overhead." The account itself (styled "Bill of Particulars" in the affidavit) suggests an *entire* transaction, fully completed, the total cost of which is $14,165.37 and on which $7,350 has been paid on account. If Murray's version is proven to be correct then the court was indeed misled and if what transpired in *Mason* "amounted to a fraud upon the court" then Judge Shook may have been imposed upon in like manner.

The order of 17 May 1965 will be reversed and the case remanded for further proceedings consistent with the views expressed in this opinion.

*Order reversed and case remanded.*
*Costs to be paid by appellee.*

---

4. There appears to be no dispute about the fact that Fishman never sent the account to Murray.