## OWL CLUB, INC. OF BALTIMORE *v.* GOTHAM HOTELS, LTD.

[No. 42, September Term, 1973.]

*Decided October 29, 1973.*

*Motion for rehearing filed November 23, 1973; denied November 26, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Benjamin Swogell* for appellant.

*B. Conway Taylor, Jr.*, with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

We are presented here with a question both narrow in scope and in no way remarkable. The details of what happened make interesting but hardly exciting reading. We shall confine ourselves, however, to those facts and circumstances pertinent to the issue.

On 24 July 1972 the appellant (Owl) sued the appellee (Gotham) and The Snowden Corporation (Snowden). With but minimal editing the declaration is as follows:

## COUNT 1

FOR THAT on or about June 1, 1971, Gotham was owner and operator of the Belvedere Hotel and it entered into a written lease with Snowden whereby it leased the entire premises for a period of ten years and three months. That the said lease contained a provision giving the tenant unrestricted right to assign the lease or to sub-let all or a portion of the premises. That on July 1, 1971 Snowden entered into a written lease agreement with Owl whereby it leased The Owl Room, consisting of a bar and adjacent grill, the first floor kitchen and a portion of the basement storage area. That after Owl opened the restaurant the U. S. Government picked up the liquor license because Gotham owed the Government a large sum of money for back taxes. That Owl was forced to be closed for a period

of three weeks and was not permitted to reopen until it paid to the United States Government the sum of $1,000.00 to be applied to the Gotham tax claim. That Owl was unable to transfer the license to its name because there was owed a large sum to Baltimore City for personal property tax. Owl was forced to pay to the City of Baltimore a large sum of money for Gotham in order to reopen. That due to being closed for this period of time Owl suffered a large amount of damages which were caused by Gotham's failure to pay its taxes.

WHEREFORE Owl claims $10,000.00 damages.

### COUNT 2

For that Owl entered into a lease for the Owl Room, bar and kitchen as outlined in Count 1 herein and for that Gotham and Snowden in violation of the said written lease prevented Owl from operating on the premises and on June 28, 1972 Gotham and Snowden placed a padlock upon the premises and forcibly prevented Owl from occupying the premises and conducting its business. Thereof as a result Owl sustained great damages and suffered a great monetary loss.

WHEREFORE, Owl claims $100,000.00 damages.

On 25 July the sheriff's deputy "summoned Gotham, a [foreign] corporation by service on United Corporation Company, Resident Agent, by service on Cyril R. Murphy, Secretary." Copies of the narr, the notice to plead and the writ of summons were left with Murphy. Snowden was returned Non Est in July, August and September after which attempts to obtain service upon it were abandoned.

Murphy, a member of the Baltimore bar, testified he is the Assistant Secretary of United Corporation Company (United). He recalled the delivery to him by the deputy sheriff of the narr, the notice to plead and the writ of summons on 25 July. On the same day he sent those papers to his company's New York office where, he learned later, they were received by David Jackman who in turn mailed

them to Jerry Wender, Gotham's attorney, at Gotham Hotels, Ltd., 405 Lexington Avenue, New York, New York 10017. He said he believed "that every piece of correspondence sent out by his company has its name and address on the envelope." It seems the letter to Wender was never returned to United. Wender said he never saw it.

On 14 September, about three weeks after the time for filing a defensive pleading had expired, Owl moved for a judgment by default. The judgment was entered on the same day.

James V. Campbell is the Civil Assignment Commissioner for the Supreme Bench of Baltimore City. He testified that a request was made to calendar an inquisition on the default judgment. On 16 October, he said, a card and a summons were sent to United stating that the inquisition had been set for 26 October. Murphy said service of the card and the summons was accomplished at 11:15 a.m. on 18 October, that they were mailed to New York on the same day and that, he learned later, they were received by David Jackman at the New York office on 20 October. Murphy said also that his company "has only one service to perform and that is getting the summons and getting them to the client as quickly as possible."

At the conclusion of the inquisition on 26 October Carter, J., directed the entry of judgment on Count 1 for $10,000 and on Count 2 for $100,000. We have set forth below an excerpt from an item which appeared in The (Baltimore) Sun of Wednesday, 1 November 1972:

> "*From Belvedere Hotel*
> > "Owl Club owners get
> > $110,000 judgment
> > "By George J. Hiltner
>
> "The financial woes which have beset the owners and operators of the now-vacant Belvedere Hotel increased in Superior Court yesterday when a $110,000 judgment was recorded against them.
>
> "The judgment was obtained by the Owl Club,

Inc., which leased the well-known Owl Room bar and grill in the hotel.

"Judge Joseph L. Carter awarded full damages to the club when Gotham Hotels, Ltd., the owner, and the Snowden Corporation, which leased the premises from Gotham, failed to answer or contest the litigation.

\* \* \* "

John J. Moran testified that he is a vice president of Monumental Life Insurance Company, the holder of the first mortgage on the Belvedere Hotel. The amount due at the time was "about $775,000." Moran said "it was ... [his] loan" and that he was the one who had to "worry about when the payments are coming in." He said that "as soon as ... [the Hiltner article] was published in the paper" he made a series of calls to Gotham and that he "finally talked to Al Simon," one of Gotham's vice presidents. Moran said that when he told him about the $110,000 judgment Simon said, "What is the price of a bus fare to [in?] Baltimore." Moran said, "Thirty cents." According to Moran, Simon replied "that is what it's [the judgment] worth."

On 15 December 1972 Owl directed the issuance of the writ of *fieri facias*. What follows is Moran's letter of 29 December to Simon:

"In accordance with our telephone conversation, I am enclosing a copy of the notice of the Sheriff's Sale of the Belvedere Hotel in Baltimore, to take place January 16. I assume someone in your organization has been served notice by the Sheriff."

In the forenoon of 16 January 1973 (the sheriff's sale was scheduled for 2:00 p.m.) Gotham filed a petition to enjoin the sale and to strike out the judgment. In its petition Gotham alleged it had no knowledge of the litigation until 28 December and that the "judgment was obtained by way of fraud, and/or was predicated upon mistake and/or was based upon or affected by irregularity." It claimed also to have "a complete, meritorious, legal defense" to Owl's suit and that "the case has never been heard on the merits."

Gotham's petition came on for a hearing before Judge Carter on 8 February 1973. On 7 March he struck out the judgment and gave Gotham 15 days "to file appropriate pleadings." In his opinion the learned chancellor said, in part:

> "The courts are very loath to set aside judgments after they become enrolled; but the rule relating to revisory power and control over judgments serves a good and proper purpose. It provides a method for control over judgments entered wherein fraud, mistake or irregularity is present. The plaintiff argues that the rule must be applied differently in a law case as against an equity case. . . .
>
> * * *
>
> "Frankly, I see no difference and I do not believe that the law would tolerate any difference in this area of justice between a case in Equity and one at Law. Where there is evidence that there has been no hearing on the merits and when the defendant has an apparent meritorious defense, and where there is evidence that the true facts of the case have not been disclosed to the Court at the time either of the default judgment or the inquisition, it must be concluded that there was either fraud, mistake, or irregularity as contemplated by the Rule, that would justify striking out the judgment; provided application therefor is promptly made. In this case, it is my opinion that due diligence was exercised on the part of the defendant after learning of the situation. I might add that had the facts of this case and the leases involved been made known to me at the time of the inquisition, I would not have entered judgment.
>
> "In my opinion, and for the foregoing reasons, justice requires the exercise of the discretion placed in the court under Rule 625A, and the judgment by default and the inquisition following said judgment are hereby stricken. . . ."

The learned trial judge has voiced a notion with which we cannot agree. It is true, to be sure, that Maryland Rule 625 a, by virtue of Rule 1 a 1, applies "to procedure generally, both at law and in equity." Rule 671 a establishes the same 30 day period for the enrollment of a decree in equity. In respect of judgments, however, it is now firmly established that the power of the court to revise and control an enrolled judgment is no longer discretionary. Quite recently, in *Marine Midland Trust Co. v. State National Bank,* 268 Md. 503, 302 A. 2d 609 (1973), we took the liberty of saying once more what we have said countless times in the past that, in addition to proving fraud, mistake or irregularity, one seeking to set aside an enrolled judgment must establish also that he is acting in good faith and with ordinary diligence, and that he has a meritorious defense. We have not found, nor have we been shown, any Maryland case in which an enrolled judgment, as distinguished from an enrolled decree, has been set aside because the case had not been heard on the merits or because there were circumstances such as to satisfy the court that the judgment should be set aside.

We are not persuaded that so well established a pattern should be exposed to the erosion urged by Gotham, especially in the circumstances of the case before us. If United failed to acquaint Gotham with the existence of Owl's suit, a circumstance which strikes us as unlikely, it was certainly no fault of Owl. Gotham had designated United as its resident agent and the statute, Code (1973 Repl. Vol.), Art. 23, § 90, provides that service of process upon any such resident agent "shall bind such foreign corporation in any action in which it is subject to suit in this State . . . ." It is true, of course, that the default judgment entered on 14 September 1972 was interlocutory only. But this is not to say it is not a judgment contemplated by Rule 625 a. In *Maggin v. Stevens,* 266 Md. 14, 16, 291 A. 2d 440 (1972), we said Rule 625 a "is applicable to all final judgments including judgments by default for want of a plea." We said, also, that such a judgment need not be extended to be appealable. We have not found in this record

any evidence which could support a finding that the obtention of that judgment was tainted with fraud, mistake or irregularity. As far as these parties are concerned it became impregnable on 16 October 1972.

To believe that Gotham failed to receive the first notice and summons is not easy; to believe it failed to receive the second notice and summons requires extra effort. It is clear, however, that they were served on United on 18 October and, as we have said, that was sufficient. Should this seem unduly hard-nosed it should be recalled that the inquisition took place on 26 October, that final judgment was entered on the same day and that the 30 day period expired on 27 November. The Hiltner article appeared on Wednesday, 1 November. Moran said that "as soon as" it was published he telephoned Gotham. It seems fair to assume that his information had been imparted to Gotham by Monday, 6 November. It is at once apparent that Gotham then had three weeks in which to move to set aside the $110,000 judgment. There can be little doubt that, had it done so, the judgment would have been set aside and that the court would have ordered the inquisition to be tried de novo. Its failure to bestir itself until 16 January, the day set for the sheriff's sale, is reminiscent of what we said in *Marine Midland, supra:*

> ". . . But the problem here is not the construction of an indemnity agreement; it is the integrity of a judgment obtained as a result of the deliberate, multiple, inexplicable and unexplained default of Marine Midland. And that judgment is a hard, cold, ineluctable fact. Were we to overturn it we might as well make a bonfire out of the Maryland Rules and a number of our recent decisions as well." 268 Md. at 510.

Gotham tells us that *Murray v. Fishman Construction Co.,* 241 Md. 538, 217 A. 2d 357 (1966), provides solid support for its position. We do not agree. *Murray* has many distinguishing features only a few of which need be mentioned here. There was no interlocutory default

judgment in *Murray*. There plaintiff's counsel, in violation of a clear understanding with defendant's counsel, obtained, without notice, a judgment for $6,815. When plaintiff's counsel discovered this some six weeks later he filed a motion to set aside the judgment. Although there were a number of circumstances which might have justified striking the judgment the trial judge denied the motion without a hearing. We reversed and remanded the case for further proceedings. In the case at bar Judge Carter held a hearing but, as we have indicated, Gotham failed to establish the essential requirements, one of which, and the only one we shall dwell upon, is the need to show that it had acted in good faith and with ordinary diligence. We find it impossible to attribute good faith and ordinary diligence to a defendant whose estimate of the worth of a $110,000 judgment is 30 cents, particularly at a time when it had at least 20 days of the 30 day period in which to file a motion to set it aside. That it waited until the morning of the day of sale does not diminish the lack of diligence.

> *Order of 7 March 1973 striking judgment by default and the inquisition reversed.*
>
> *Case remanded for the reinstatement of the judgment entered on 26 October 1972.*
>
> *Costs to be paid by the appellee.*