## GOTHAM HOTELS, LTD. *v.* OWL CLUB, INC. OF BALTIMORE

[No. 819, September Term, 1974.]

*Decided May 7, 1975.*

159

The cause was argued before THOMPSON and POWERS, JJ., and MARVIN H. SMITH, Associate Judge of the Court of Appeals, specially assigned.

*B. Conway Taylor, Jr.* and *Read K. McCaffrey* for appellant.

*Benjamin Swogell* for appellee.

SMITH, J., delivered the opinion of the Court.

Appellant, Gotham Hotels, Ltd. (Gotham), sought unsuccessfully in the Circuit Court of Baltimore City to circumvent the holding of the Court of Appeals in *Owl Club v. Gotham Hotels*, 270 Md. 94, 310 A. 2d 534 (1973). It will be equally unsuccessful here.

The factual background must be briefly recounted for a clear understanding of the matter. Gotham owned the Belvedere Hotel in Baltimore, a formerly renowned hostelry which had fallen upon hard times. It leased the hotel to The Snowden Corporation (Snowden). Snowden sublet a portion of the premises including The Owl Room to appellee, Owl Club, Inc. of Baltimore (Owl). Owl sued Gotham and Snowden in the Superior Court of Baltimore City. Summons for Gotham was laid in the hands of its corporate resident agent. Judge McWilliams said for the Court in *Owl Club*, 270 Md. at 96, that an officer of the resident agent testified that the suit papers were forwarded to its New York office, which in turn forwarded them to Gotham's attorney. Owl

moved for a judgment by default when a responsive pleading was not entered within the time specified in the Maryland Rules. Judgment by default was entered on the same day, September 14, 1972, which was several weeks after the time for pleading expired. Owl requested that the case be set down for an inquisition on the default judgment. Notice of this hearing was mailed by the Baltimore City assignment commissioner to the resident agent. The resident agent also forwarded this notice to its New York office which said it forwarded the notice on to Gotham. No appearance was made on behalf of Gotham at the inquisition. Judgment in the amount of $110,000 was entered in favor of Owl against Gotham on October 26, 1972.

There was testimony in *Owl Club* that when the vice-president of the insurance company which held the first mortgage on the Belvedere called one of Gotham's vice-presidents a few days after the extension of the judgment as a result of a news account he had read in the local press relative to the judgment, he is said to have been informed by that Gotham vice-president that the judgment was worth about 30 cents, the price of bus fare in Baltimore.

Owl directed the issuance of the writ of *fieri facias* on the judgment on December 15, 1972, as a result of which a sheriff's sale of the hotel was scheduled for January 16, 1973. On the morning of January 16 Gotham filed a petition in the Superior Court of Baltimore City. Claiming that it had no knowledge of the litigation until December 28, 1973, it alleged that the "judgment was obtained by way of fraud, and/or was predicated upon mistake and/or was based upon or affected by irregularity." It claimed to have "a complete, meritorious, legal defense" to Owl's suit and said that "the case ha[d] never been heard on the merits." The judgment was ordered stricken. On appeal Judge McWilliams said for the Court:

> "In the case at bar Judge Carter held a hearing but, as we have indicated, Gotham failed to establish the essential requirements [for striking a judgment], one of which, and the only one we shall

dwell upon, is the need to show that it had acted in good faith and with ordinary diligence. We find it impossible to attribute good faith and ordinary diligence to a defendant whose estimate of the worth of a $110,000 judgment is *30* cents, particularly at a time when it had at least 20 days of the 30 day period in which to file a motion to set it aside. That it waited until the morning of the day of sale does not diminish the lack of diligence." *Id.* at 102.

*Owl Club* was decided by the Court of Appeals on October 29, 1973. On February 13, 1974, Gotham filed its bill of complaint in the Circuit Court of Baltimore City in which it prayed that Owl might be perpetually enjoined from enforcement of its judgment, asserting that the judgment was "based on fraud, concealment and misrepresentation as practiced before both the Superior Court of Baltimore City and the Court of Appeals of Maryland." A demurrer interposed by Owl was sustained with leave to amend. A demurrer to an amended bill of complaint was sustained without leave to amend. This appeal followed.

The amended bill of complaint recites the filing of suit by Owl on July 24, 1972, "wherein [Owl] alleged certain damages arising from a lease as between it and The Snowden Corporation . . . and arising from certain acts by [Gotham]"; that Snowden was not served, "however, a default judgment was rendered against Gotham on September 26, 1972"; that on October 26, 1972, in the Superior Court of Baltimore City an inquisition was held "to determine damages suffered by the Owl Club as against [Gotham] allegedly in default," at which inquisition "it was shown that the resident agent of Gotham . . . had been served in Maryland," and "[d]amages allegedly suffered by Owl Club were assessed to be One Hundred Ten Thousand Dollars"; that on January 16, 1973, a hearing was held on Gotham's motion to set aside this judgment and inquisition prior to an attempt to sell the Belvedere "wherein Gotham introduced the fact that at the inquisition, a lease, as

between Snowden Corporation and Gotham was introduced — however, a subsequent lease between the Snowden Corporation and Owl Club was never introduced into evidence nor alluded to, and that the fact that the . . . Owl Club had no contract, agreement or understanding of any kind with Gotham was improperly and fraudulently concealed from the Superior Court," as was "the fact that the Snowden Corporation was in default on its obligations to Gotham" (followed by a lengthy quotation from the opinion of the trial judge setting aside the judgment); that following the striking of the judgment an appeal was entered to the Court of Appeals of Maryland "and that body saw fit to reverse [the trial judge's] opinion with regard to the striking of the judgment," but "[n]owhere in its opinion did the Court of Appeals of Maryland address itself to the leases in question, and the fraud and concealment practiced by the Owl Club as discussed by [the trial judge] and as alleged by Gotham"; that Gotham's motion for reargument in the Court of Appeals was denied and it "has, therefore, exhausted all remedies and actions at law"; that "[i]n anticipation of Owl's defense of res judicata" Gotham "contends that those equitable defenses not raised before the Superior Court of Baltimore City or in the Court of Appeals of Maryland, which remain available to it in . . . a Court of Equity, are: (a) [t]he power of the Equity Courts to enjoin judgments obtained by fraud where the fraud is demonstrated to have been extrinsic, i.e., fraud practiced upon the unsuccessful party and preventing him thereby from presenting his case; (b) [t]hat it is a generally accepted principle of equity that extrinsic or collateral fraud practiced in another Court on which a judgment was based may, in the discretion of the Equity Court, result in equitable relief where the unsuccessful party was prevented from protecting his rights in the action before the judgment was rendered; (c) [t]hat the actions described above and frauds as practiced by the Owl Club constitute cause for the invocation of equitable relief on the theory that the conscience of the Equity Courts and the general principles of equity have been so obviously violated." This was followed in

the bill of complaint by three paragraphs devoted to a review of the opinion of the Court of Appeals; the allusion by the trial judge in his opinion to *New Freedom Corporation v. Brown*, 260 Md. 383, 272 A. 2d 401 (1971), an equity case, which said, " 'however, originally, there was no determination on the merits and in such circumstances an enrolled decree may be set aside on a petition filed in the original proceedings if there is a showing that the decree was entered by surprise or mistake or if the circumstances are such as to satisfy the Court in the exercise of a sound discretion that the decree should be set aside' "; and the statement that the Court of Appeals in its opinion in *Owl Club* did not address itself to the relief sought by Gotham since it "did not find that good faith had been practiced."

Gotham in its argument to us sees three questions, (1) whether "the Circuit Court for Baltimore City err[ed] in finding in its Order that the fraud, if any, committed by Owl Club, if proven, would not meet the standard required to invoke equitable relief and did not constitute an action on the part of the Defendant that prevented Gotham Hotels from presenting its defense"; (2) whether that court erred "in not permitting the presentation of a defense on the merits by [Gotham] before rejecting equitable relief"; and (3) whether that court erred "in not addressing itself to and not finding that general maxims of equity are violated if the Owl Club, Inc. of Baltimore is allowed to pursue its judgment."

The contentions of Gotham may be boiled down into two, that equity will act to set aside a judgment in an action at law not tried on its merits if it was procured by fraud and that in this instance extrinsic fraud was present.

One of the earlier cases involving equity and fraud relative to a judgment at law is *Marine Insurance Company of Alexandria v. Hodgson,* 11 U. S. (7 Cranch) 332, 3 L. Ed. 362 (1813). A vessel there had been insured by an insurance company for a voyage "from St. Domingo to her port of discharge in the Chesapeake." It was captured. The owner obtained a judgment in the amount of $8,000 under the insurance policy. The insurance company brought suit in

equity to obtain an injunction against enforcement of the judgment, claiming that the agent for the insured misrepresented the age and tonnage of the vessel. The Court said that "[t]here [was] reason to believe that she was not worth more than $3,000." Upon the basis of a valuation of $10,000 she had been insured for $8,000, in accordance with the company's practice of not insuring any vessel for more than four-fifths of her real value. In the circumstances of that case the Court found no fraud to have been practiced. In the process of its opinion Mr. Chief Justice Marshall said for the Court, however:

> "Without attempting to draw any precise line to which courts of equity will advance, and which they cannot pass, in restraining parties from availing themselves of judgments obtained at law, it may safely be said that any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law; or of which he might have availed himself at law, but was prevented by fraud or accident unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery.
>
> "On the other hand it may with equal safety be laid down as a general rule that a defense cannot be set up in equity which has been fully and fairly tried at law, although it may be the opinion of that court that the defense ought to have been sustained at law.
>
> "In the case under consideration the plaintiffs ask the aid of this court to relieve them from a judgment, on account of a defense which, if good anywhere, was good at law, and which they were not prevented, by the act of the defendants, or by any pure and unmixed accident, from making at law.
>
> "It will not be said that a court of chancery cannot interpose in any such case. Being capable of

imposing its own terms on the party to whom it grants relief, there may be cases in which its relief ought to be extended to a person who might have defended, but has omitted to defend himself at law. Such cases, however, do not frequently occur. The equity of the applicant must be free from doubt. The judgment must be one of which it would be against conscience for the person who has obtained it to avail himself.

"The court is of opinion that this is not such a case." *Id.* 3 L. Ed. 336-37.

In *Gott v. Carr,* 6 Gill & Johns. 309 (1834), judgments had been entered before a justice of the peace in favor of the defendant against the plaintiff on three notes. The plaintiff appealed to the county court. It reversed, entering judgments in favor of the plaintiff. The defendant then filed a bill in equity to prevent execution upon those judgments on the ground that there had been threats and fraud in the procurement of the notes; that the defendant was unable "to prove in a Court of Law the want of consideration for the notes, they being under seal," and that the judgments "were founded upon the testimony of [an individual], . . . stated to have been interested in the event of the suits, but who [in the opinion of the Court of Appeals did] not appear to have had the slightest interest." In the process of reversing the decision by the chancellor, Chief Judge Buchanan said for the Court:

"The questions presented for the consideration of the Court, are: 1st. Do the judgments at law in favor of the appellant, Susanna J. Gott, bar the defendant from maintaining this suit? 2d. If they do not, is the defendant, upon the case made by the bill and answers, and the proof taken in the cause, entitled to a perpetual injunction of those judgments?

"1. As to the preliminary question. It is a salutary principle of law, that every person is bound to take care of and protect his own rights

and interests, and to vindicate them in due season, and in the proper place. And that if a defendant having- the means of defense in his power in an action against him, in a competent tribunal, neglects to use them, and suffers a recovery to be had against him, he is forever precluded from obtaining relief in Chancery, in relation to the same matter. The application of this principle may not be universal; but the cases in which Chancery will furnish relief against recoveries suffered to be had at law, are exceptions. The well settled general rule being, that a Court of equity will not relieve against a recovery in a trial at law, unless the justice of the verdict can be impeached by facts, or on grounds, of which the party seeking the aid of Chancery, could not have availed himself at law, or was prevented from doing it by fraud or accident, or the act of the opposite party, unmixed with any negligence or fault on his own part.

"And Chancery will only sustain a bill invoking its aid upon some new matter of equity, not arising in the former case; or seeking some relief, to which the powers of the Court of law were not fully adequate.

"It is a sound and useful rule in the administration of justice, for the prevention of negligence, and harassing and protracted litigation, and the consequent burdensome accumulation of costs. A material departure from, or relaxation of which, would prove vexatious in practice, and be felt as a public grievance, by the great delays, and sometimes abuse of justice, to which it would lead. The effect might often be to prevent the prosecution of a just claim, by an injured and oppressed party, for the want of adequate means to pursue it through a protracted litigation, with a more fortunate adversary, whose object was delay, when the unavoidable expenses of the controversy would sometimes exceed the amount in dispute; and

when, although he should ultimately succeed, his success might in effect prove a loss, or come too late to be of much service. Applying then that rule to this case, which we think is clearly within it, it appears to us, that whatever may in truth be its abstract merits, it is not a case for the interposition of Chancery, and that the injunction ought not to have been granted, or being granted, should not have been perpetuated." *Id.* at 312-13.

From *Gott* and *Marine Insurance Co.* there may be deduced two bases for avoiding a judgment at law in equity at the time *Gott* was decided, the unavailability of an equitable defense in the law action or extrinsic fraud. Pleas on equitable grounds in actions at law, now permitted by Maryland Rule 342 d 1 (a), have been a part of the Maryland scheme of things since passage of Chapter 547 of the Acts of 1888, most recently codified as Code (1951) Art. 75, §§ 91-93, where it stood without change from the time of its original passage until its repeal by Chapter 399 of the Acts of 1957, having been supplanted by that rule. *See generally* 1 Poe, *Pleading & Practice* § 667A (5th ed. Tiffany 1925).

The cases cited by Gotham in support of its theory that a final judgment may be set aside in equity where an action has not been tried on its merits involve final decrees in equity, not judgments in law actions. This court had occasion in *Capobianco v. Gordon,* 19 Md. App. 662, 313 A. 2d 517 (1974), to comment upon the "separate standards for setting aside judgments at law and decrees in equity" said to have existed "prior to the adoption of Rule 625 a." It was noted that Rule 5 o defines "judgment" as a "judgment at law, decree in equity or other act or order of court final in its nature . . . ." Judge Lowe said for the court:

"We hold therefore, in adopting Md. Rule 625 a, the Court of Appeals intended to restrict courts' revisory power over all enrolled judgments at law to the three grounds set forth in the Rule." *Id.* at 672.

To the discussion there by Judge Lowe could be added

*Vierling v. Holt,* 197 Md. 522, 526, 80 A. 2d 24 (1951), referred
to by Judge Prescott for the Court of Appeals in *Pugh v.
Waclawski,* 211 Md. 346, 351, 127 A. 2d 376 (1956). *Pugh* and
*Vierling* were both decided prior to the adoption of Rule 625
a. In *Vierling* Chief Judge Marbury, at 525 of 197 Md., said
that the rule had "sometimes been stated as if there were
*three* cases under which an enrolled decree could be voided
by petition, the first being where the case was not heard on
its merits, the second, where the decree was entered by
mistake or surprise, and the third, where the circumstances
satisfied the court that the enrollment ought to be dis-
charged." (Emphasis in original.) He pointed out (at p. 526)
that "[t]he earlier cases, upon which [the later] mentioned
decisions also rel[ied] for authority, indicate[d] that instead
of there being three classes of cases, there are only two, (1)
where the decree was entered by mistake or surprise, and
(2), where the circumstances are such as to satisfy the court
that the decree should be set aside, and that, in each of these
two classes of cases, it must also appear that the case has
not been heard upon the merits." In conclusion on this
subject he said:

> "The final result of all the decisions seems to be
> that no petition to strike out an enrolled decree
> should be granted where the case has originally
> been heard on the merits, although where there are
> extraordinary features which make it imperative in
> the interest of justice that the case be reopened,
> this requirement has sometimes been overlooked."
> *Id.* at 527.

Code (1951) Art. 75, § 66 relative to continuances "where a
judgment [was] set aside for fraud or irregularity," came
into Maryland law with the enactment of Chapter 9 of the
Acts of 1787. It, too, was unchanged until its repeal by
Chapter 399 of the Acts of 1957. This section was said by the
Court of Appeals in *Kemp v. Cook,* 18 Md. 130, 137 (1861), to
give "no additional powers to the court, in respect of
correcting or setting aside judgments," this being but, as put
in 2 Poe, *op. cit.* § 388 in a footnote, a recognition of what the

Court called in *Kemp* the "common law power incident to courts of record . . . ." Interestingly enough, in *Gardner v. Jenkins*, 14 Md. 58 (1859), where the Court of Appeals set aside an injunction against enforcement of a judgment at law based upon fraud in the procurement of the judgment, Chief Judge Le Grand for the Court, in addition to stating that "[t]he bill [did] not allege any *fraud* on the part of the [plaintiff], but merely against the deputy of the sheriff of Baltimore City," said:

> "Besides these objections, the party had the right to proceed under the Act of 1787, chapter 9, and he availed himself of it. The judgment of the court being against him he is concluded thereby." *Id.* at 62.

In *Ahern v. Fink*, 64 Md. 161, 3 A. 32 (1885), Chief Judge Alvey said for the Court of Appeals:

> "There was clearly no want of jurisdiction by the justice to render the judgment; and if the disability of coverture could afford defense, it was incumbent upon the appellee to appear and avail herself of it. This she wholly neglected to do; and the judgment was rendered against her when she was *sui juris*, and liable to be treated as a party in default. She was then under no disability, and she could only be treated as any other defaulting party would be for default of appearance and answer. And *having failed to appear and avail herself of her defenses, if any she had, she has no standing in a Court of equity to obtain relief against a judgment rendered against her by her own default, in the absence of clear proof of fraud or surprise, unmixed with negligence or fault on her part.* The appellee was bound to be present before the magistrate in person, or by agent or attorney, to take care of her rights and to make proper defenses for her protection, and she cannot make the omission to perform that duty, incumbent upon every defendant, the foundation of relief by injunction to

restrain the execution of the judgment. The case of *Gott v. Carr*, 6 G. & J. 309, would seem to be a conclusive authority against the present application." *Id.* at 164. (Emphasis added.)

It is said in 3 Pomeroy, *Equity Jurisprudence* § 919a (5th ed. Symons 1941):

"When a judgment or decree of any court, whether inferior or superior, has been obtained by fraud, the fraud is regarded as perpetrated upon the court as well as upon the injured party. The judgment is a mere nullity, and it may be attacked and defeated on account of the fraud, in any collateral proceeding brought upon it or to enforce it, at least in the same court in which it was rendered. [For this rule to apply, however, the fraud must be such as to render the judgment void in that the jurisdiction of the court is concerned, or it must appear that the person attacking the judgment is a stranger to the record whose pre-existing rights are prejudicially affected by the fraud.]" (Brackets in original.) *Id.* at 603-04.

The author goes on to state in § 919b:

"It must appear that the fraud was practiced in the very act of obtaining the judgment. In other words, a court of equity will set aside or annul a judgment at law on the ground of fraud only where the fraud is extrinsic or collateral to the matter tried in the original action, and not where the fraud was in the matter on which the judgment was rendered. Fraud, whether committed on the court or on the opposite party or on both, may be extrinsic within the meaning of the rule when its effect is to prevent the unsuccessful party from having a trial or from presenting his case fully, as, for instance, keeping him away from court by false promise of compromise, or purposely keeping him in ignorance of the pendency of the action." *Id.* at 608-09.

*See also Restatement of Judgments* § 118, comment (*b*) (1942).

The matter of intrinsic and extrinsic fraud was most recently considered by the Court of Appeals in *Schwartz v. Merchants Mort. Co.*, 272 Md. 305, 322 A. 2d 544 (1974), where there was an attempt in equity to set aside in a separate proceeding a prior equity decree with an allegation that the decree "was tainted by conspiracy, entered into by the appellees prior to the trial and executed by them during the course of the proceedings through the commission of perjury and the suppression of material evidence, which brought about an erroneous result." Judge Digges there fully and thoroughly reviewed the law, observing that under the prior Maryland decisions:

> "[It is] settled beyond question that an enrolled decree will not be vacated even though obtained by the use of forged documents, perjured testimony, or any other frauds which are *'intrinsic'* to the trial of the case itself. Underlying this long settled rule is the principle that, once parties have had the opportunity to present before a court a matter for investigation and determination, and once the decision has been rendered and the litigants, if they so choose, have exhausted every means of reviewing it, the public policy of this State demands that there be an end to that litigation." *Id.* at 308.

* * *

> "Examples of what would be considered *'extrinsic'* fraud were provided in [*United States v.*] *Throckmorton* [, 98 U. S. 61, 25 L. Ed. 93 (1878)]:
>
> > 'Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the

plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side, — these, and similar cases which show that there has never been a real contest in the trial or hearing of the ·case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing.' 25 L. Ed. at 95.

* * *

"These cases [(*Fisher, Adm'x v. DeMarr*, 226 Md. 509, 174 A. 2d 345 (1961); *Bachrach v. United Cooperative*, 181 .Md. 315, 29 A. 2d 822 (1943); *Tabeling v. Tabeling*, 157 Md. 429, 146 A. 2d 389 (1929); *Wilmer v. Placide*, 144 Md. 372, 125 A. 60 (1924); and *Pressler v. Pressler*, 134 Md. 243, 106 A. 686 (1919))] establish that fraud is extrinsic when it actually prevents an adversarial trial, but is intrinsic when it is employed during the course of the hearing which provides the forum for the truth to appear, albeit that truth was distorted by the complained of fraud. This is necessarily so, as the very object of the trial is to assess the truth or falsity of the often conflicting testimony and documents presented." *Id.* at 309.

As was pointed out by Judge McWilliams in *Owl Club*, there actually were two enrolled judgments involved, the default judgment entered on September 14, 1972, and the judgment for money damages entered on October 26 at the conclusion of the inquisition. There is not the slightest implication in the bill of complaint here nor in the earlier proceeding that any fraud of any kind was involved in the obtention of the judgment by default. The claim of Gotham that there was fraud here because had the lease between Snowden and Owl been before the trial judge he would have perceived there was no contractual relationship between Owl

and Gotham and therefore there was no liability from Gotham to Owl could have had no bearing on the entry of the judgment by default for want of a plea, since in the normal entry of such a judgment a trial judge only has before him the declaration and the motion for judgment by default. The failure by Gotham to plead constituted an admission by it of liability for the cause of action set forth in the declaration, there being left open for determination only the amount of damages sustained under that cause of action to be established by the inquisition pursuant to Rule 648. *Millison v. Ades of Lexington,* 262 Md. 319, 328, 277 A. 2d 579 (1971), and *Kiersted v. Rogers,* 6 Harr. & J. 282, 285 (1824). There is an implied contention by Gotham that Owl misrepresented the true situation to the court because it failed to file its lease as an exhibit to the declaration. This likewise is without merit because it was not required to file the contract as an exhibit to its declaration. This was evidentiary matter which would have come before the court if there had been a trial on the merits. If Gotham had appeared at the inquisition for extension of judgment it would have been faced with the holding of the Court of Appeals in *Millison* where a judgment by default for lack of a timely plea was entered against the defendants. The suit was one by a tenant against his landlords for damages to a stock in trade brought about, so it was contended, by the fact that the landlords "willfully, deliberately, purposefully, maliciously and intentionally failed to make the necessary repairs to the building as required by the lease although they were requested to do so on numerous occasions by [the tenant]" and that as a direct result of that failure the stock in trade was damaged. There was a clause in the lease to the effect that all goods and personal property on the leased premises were to be held at the sole risk and hazard of the tenant. The Court of Appeals pointed out that the "Court [could not] go behind the judgment by default to examine into and determine upon the validity of the cause of action upon which suit [was] instituted, *Stansbury v. Keady,* 29 Md. 361, 368 (1868), and any testimony offered to contradict liability [was] inadmissible, *Betz v. Welty,* 116 Md. 190, 195, 81 A. 382 (1911)." The Court said:

"Millison and Patuxent by failing to plead within the required time and thus permitting judgment by default on the issue of liability to be entered against them are now foreclosed from contesting their liability when inquiry is being made into the amount of damages and, therefore, may not now present this exculpatory clause as a bar." *Id.* at 328-29.

We conclude that in Maryland before an equity court may set aside a judgment in law the party attacking the judgment must allege and prove extrinsic fraud, such fraud as, in the words of the Court in *Schwartz,* "actually prevents an adversarial trial." It will be seen that Gotham has alleged no conduct on the part of Owl which "prevented [Gotham] from exhibiting fully [its] case." No fraud or deception on the part of Owl is said to have kept Gotham away from court. The contention that fraud was practiced on the trial court by not exhibiting the leases to it is no different from the contention in *Schwartz* that the decree there obtained "was tainted by a conspiracy, entered into by the appellees prior to the trial and executed by them during the course of the proceedings through the commission of perjury and the suppression of material evidence . . . ." The claim of Gotham here fits into the definition of intrinsic fraud in *Schwartz* since it concerns the presentation of evidence "during the course of the hearing which provides the forum for the truth to appear . . . ." Accordingly, the chancellor did not err in sustaining a demurrer to Gotham's amended bill of complaint.

*Order affirmed; appellant to pay the costs.*