713 A.2d 962

PORTER HAYDEN COMPANY et al.

v.

Barbara BULLINGER et al.

No. 56, Sept. Term, 1997.

Court of Appeals of Maryland.

May 15, 1998.

Reconsideration Denied June 26, 1998.

**454**

Gardner M. Duvall, Dwight W. Stone, II, Padriac McSherry Morton, Whiteford, Taylor & Preston. L.L.P., Baltimore, for Porter Hayden Co.

Thomas G. Hungar (Larry L. Simms, Gibson, Dunn & Crutcher, L.L.P., Washington, DC; John P. Sweeney, Gregory Lockwood, Miles & Stockbridge, Baltimore, all on brief), for Owens Corning.

William C. Burgy, Timothy J. Hogan, (Peter T. Nicholl, the Law Offices of Peter T. Nicholl), Baltimore, John Herrick (Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC; David M. Layton, Ashcraft & Gerel, Baltimore, all on brief), for respondents.

Russell D. Karpook, Lee Baylin, Lisa–Gail Kingsley Jenkins, Francomano & Karpook, P.A., Baltimore, amicus curiae.

Elizabeth D. Rodriguez, Francis J. Lawall, Charles H. Carpenter, Pepper, Hamilton & Scheetz, L.L.P., Washington, DC, amicus curiae.

David T. Austern, Pamela Crewe–Allen, Manville Personal Injury Settlement Trust, Fairfax, VA, amicus curiae.

Anne E. Cohen, Debevoise & Plimpton, New York City, amicus curiae.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and DALE R. CATHELL, Judge (Specially Assigned).

DALE R. CATHELL, Judge (Specially Assigned).

We granted the petition for writ of certiorari presented by Owens Corning Fiberglass Corporation (Owens Corning) and

Porter Hayden Company (Porter Hayden), petitioners, to address three issues arising out of verdicts rendered against them in a consolidated asbestos-related personal injury action in the Circuit Court for Baltimore City. The issues presented are: (1) whether the trial court had the authority to determine the application of co-defendant contribution claims when a federal court was to address the application of Maryland set-off principles in a pending federal class action proceeding involving the parties to the instant appeal; (2) whether the trial court erred in refusing to disclose to petitioners the amount in the settlement agreements negotiated between the plaintiffs and other joint tort-feasors; and (3) whether a default judgment constitutes a finding of liability for purposes of the application of section 3–1404 of the Courts and Judicial Proceedings Article. Because of our resolution of the second issue, it is unnecessary for us to address the first issue presented by petitioners. We shall also address the third issue.

## I. FACTS

This appeal requires us to examine two separate sets of facts that arose out of actions filed in different courts. The first set of facts involved two federal actions: one bankruptcy adjudication and one class action settlement. The second set involves the instant appeal. We shall discuss these facts separately.

### A. The Federal Cases

In 1982, Johns–Manville Corporation (Johns–Manville), a manufacturer of asbestos-related products, filed for bankruptcy primarily because of numerous asbestos-related claims brought against it. As a result of the Johns–Manville bankruptcy, the Manville Personal Injury Settlement Trust (Manville Trust) was created to compensate persons injured by asbestos-containing products manufactured by Johns–Manville. *See In re Johns–Manville Corp.,* 68 B.R. 618 (S.D.N.Y. 1986), *aff'd sub nom, Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988)(*Manville I* ).

In 1990, a class action for all of the Manville Trust beneficiaries, which included the parties in this case, was created to supersede all litigation pending against the trust in both federal and state courts. The class was created because it became apparent the trust was inadequately funded to compensate all possible beneficiaries. In 1991, a settlement regarding the distribution of Manville Trust funds was reached. *See In re Joint E. & S. Dists. Asbestos Litig.,* 129 B.R. 710 (E.D.N.Y. & S.D.N.Y.1991)(*Manville II* ). The Court of Appeals for the Second Circuit, however, vacated approval of the settlement. *See In re Joint E. & S. Dists. Asbestos Litig.,* 982 F.2d 721 (2d Cir.1992)(*Manville III* ).

Following the remand, the Trust Beneficiaries again reached a settlement. Pursuant to this settlement agreement, the Manville Trust was recapitalized and all claims against the Trust were to be removed from the various tort systems and processed according to administrative procedures called the Trust Distribution Process (TDP). Pursuant to the TDP, numerous categories of diseases resulting from exposure to asbestos were created and a monetary value placed on each category of disease. The TDP also enumerated the methods by which a co-defendant's set-off would be calculated in litigation involving the Trust Beneficiaries. The Stipulation of Settlement, however, explicitly excluded claims arising in Maryland with respect to the appropriate set-off provisions. The Stipulation of Settlement provided:

> Section H.3 of the TDP, which deals with calculation of set-off, shall not apply by operation of this Stipulation with respect to asbestos health claims arising under Maryland law. The parties consent to trial by the Courts of the issue of appropriate set-off rules that should be developed with respect to Manville or the Trust in connection with claims arising under Maryland law. . . .

*In re Joint E. & S. Dists. Asbestos Litig.,* 878 F.Supp. 473, 578 (E.D.N.Y. & S.D.N.Y.1995)(*Manville IV* ).

The Court of Appeals for the Second Circuit vacated the lower court's approval of the settlement with respect to the

Maryland set-off issue. It stated that by refusing to resolve the disagreement as to the Maryland set-off issue, the trial court "abstained from deciding the issue left unresolved by the Settlement." *In re Joint E. & S. Dists. Asbestos Litig.*, 78 F.3d 764, 775 (2d Cir.1996)(*Manville V*). The court held such an abstention was inappropriate and remanded the case back to the district court for a determination of the Maryland set-off issue.

On remand the federal district court, attempting to predict what the Maryland Court of Appeals would decide if faced with the Maryland set-off issue, held that in determining the appropriate set-off, the courts were to "exclude the Trust from calculations of other settling defendants' pro rata shares, and ... credit amounts settled by the Trust to joint tortfeasors who have not settled." *In re Joint E. & S. Dists. Asbestos Litig.*, 929 F.Supp. 1, 9 (E.D.N.Y. & S.D.N.Y.1996)(*Manville VI*). The federal district court, however, rendered this judgment on 10 June 1996, after the Maryland trial court rendered its judgment from which the instant appeal arose.

## B. The Instant Appeal

Nick Zumas, Patrick McCaffery, John Grimshaw, Ethel Marie Granski, Casimir Balonis, and Frank Krueger each filed suit in the Circuit Court for Baltimore City against petitioners and numerous other defendants, each alleging that exposure to products manufactured by petitioners caused him or her to contract asbestos-related mesothelioma. The cases were consolidated for trial by an order dated 3 April 1995.

Porter Hayden filed a third-party contribution claim against Babcock & Wilcox (B & W) on 24 April 1995. After B & W failed to file an answer and respond to discovery requests, Porter Hayden moved for default. Porter Hayden's default motion was granted on its third-party complaint against B & W, and the court entered an order of default in favor of Porter Hayden. The court ultimately entered a default judgment against B & W on 30 August 1995.

On 21 December 1995, the jury returned verdicts in favor of the plaintiffs in the Zumas, McCaffery, Grimshaw, and Granski cases. In order to reduce the verdicts to judgment, the plaintiffs provided information to the trial court for *in camera* consideration regarding settlements with the Manville Trust and with other settling joint tort-feasors.[1] Both petitioners sought to obtain this settlement information in order to understand and calculate the final judgment amounts. The court denied their requests and rendered final judgments on 13 March 1996, without affording petitioners an opportunity to examine this settlement information. In rendering the final judgments and accounting for the Manville Trust, the trial court considered the trust a joint tort-feasor but, unlike the federal court, granted a pro tanto reduction in the verdicts rendered against petitioners.

Owens Corning appealed to the Court of Special Appeals from the judgments rendered against it and in favor of the McCaffery, Zumas, Grimshaw, and Granski plaintiffs. Porter Hayden appealed only from the verdict rendered in the Grimshaw case.

The Court of Special Appeals affirmed the judgment of the trial court. As to whether the trial court had authority to reduce the verdicts to judgment despite the pending federal class action, the appellate court held the circuit court "had fundamental jurisdiction to adjust compensatory damages and issue a final judgment in the instant cases." *Anchor Packing Co. v. Grimshaw*, 115 Md.App. 134, 173, 692 A.2d 5, 24 (1997). The Court of Special Appeals also held the amounts of the settlement agreements properly were withheld from petitioners. With respect to the default judgment entered against B & W, the court held the trial court lacked the authority to "reduce Porter Hayden's pro rata share of the judgment because it was not established that B & W was a joint tort-feasor." *Id.* at 185, 692 A.2d at 30.

---

1. The docket entries reflect that plaintiffs' counsel informed the court of all release/settlement agreements and whether the amounts paid by the settling joint tort-feasors exceeded the statutory pro-rata share.

We issued a writ of certiorari to address the three issues presented by petitioners. Prior to oral argument, this Court was informed that Owens Corning settled with plaintiffs McCaffery and Zumas. Accordingly, Owens Corning appeals only from the verdicts rendered against it in the Grimshaw and Granski cases. Porter Hayden still appeals only from the judgment rendered in the Grimshaw case. Barbara Bullinger is the personal representative of the Grimshaw estate. We shall refer to Bullinger and Granski collectively as respondents.

In respect to the second issue, we hold the trial court erred in refusing to allow petitioners to inspect the amounts of the settlement agreements and we vacate the trial court's judgment as to the apportionment of liability. With regard to Porter Hayden's third issue, we hold that a default judgment constitutes a finding of liability for purposes of the application of section 3-1404 of the Courts and Judicial Proceedings Article.[2] Because we are vacating the trial court's apportionment of the damages among the joint tort-feasors in the Grimshaw and Granski cases, the federal court's apportionment decision in *Manville VI, supra,* will predate the apportionment determination to be made by the circuit court on remand. The trial court must then apply the preclusive effect of, what at that time will be the *prior,* federal court action in *Manville VI.*

We explain.

## II. THE DISCLOSURE OF SETTLEMENT AGREEMENTS

The scope of discovery under Maryland law is very broad. The pertinent discovery rule states:

---

**2.** The Maryland Contribution Among Joint-Tortfeasors Act was recodified from Article 50 of the Maryland Code to the Courts and Judicial Proceedings Article. *See* 1997 Md. Laws, ch. 31. The Revisor's Note to section 3-1401 provides: "[T]his Act may not be interpreted to render any substantive change to the Laws of Maryland." We shall cite to the Act as codified in the Courts and Judicial Proceedings Article.

**(a) Generally.**—A party may obtain discovery regarding any matter, not privileged, including the existence, description, nature, custody, condition, and location of any documents or other tangible things ... if the matter sought is relevant to the subject matter involved in the action.... It is not ground for objection that the information sought is already known to or otherwise obtainable by the party seeking discovery or that the information will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Md. Rule 2–402(a). We have noted that the purpose of the discovery rules

is to require the disclosure of *facts* by a party litigant to all of his adversaries, and thereby to eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind, concerning the facts that gave rise to the litigation. If all of the parties have knowledge of all of the relevant, pertinent and non-privileged facts, or the knowledge of the existence or where-abouts of such facts, the parties should be able properly to prepare their claims and defenses, thereby advancing the sound and expeditious administration of justice.

*Baltimore Transit Co. v. Mezzanotti*, 227 Md. 8, 13, 174 A.2d 768, 771 (1961); *see also Berrain v. Katzen*, 331 Md. 693, 697, 629 A.2d 707, 708–09 (1993); *Androutsos v. Fairfax Hosp.*, 323 Md. 634, 638, 594 A.2d 574, 576 (1991); *Kelch v. Mass Transit Admin.*, 287 Md. 223, 229, 411 A.2d 449, 453 (1980); *Williams v. Moran*, 248 Md. 279, 291, 236 A.2d 274, 281–82 (1967).

The discovery rules are broad in scope and are construed liberally to accomplish their purpose. *Berrain*, 331 Md. at 697, 629 A.2d at 709; *Androutsos*, 323 Md. at 638, 594 A.2d at 576; *Kelch*, 287 Md. at 229, 411 A.2d at 453; *Mezzanotti*, 227 Md. at 13, 174 A.2d at 771. Under the general discovery rule, a party may obtain discovery of information that is relevant and not privileged. Privileges prohibiting or limiting the introduction of evidence are created by the United States Constitution, the Maryland Constitution, statutes, and

common law. The Fifth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights protect against compulsory self-incrimination. *Evans v. State*, 333 Md. 660, 682, 637 A.2d 117, 128, *cert. denied*, 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994); *Choi v. State*, 316 Md. 529, 535, 560 A.2d 1108, 1111 (1989); *Lodowski v. State*, 307 Md. 233, 246–47, 513 A.2d 299, 306–07 (1986). There are also numerous Maryland statutory privileges. *See* Md.Code (1974, 1995 Repl.Vol., 1997 Supp.), § 9–105 of the Courts & Judicial Proceedings Article (CJ) (confidential marital communications privilege); CJ § 9–106 (spousal privilege); CJ § 9–107 (privilege against self-incrimination); CJ § 9–108 (attorney-client privilege); CJ § 9–109 (patient-psychotherapist privilege); CJ § 9–109.1 (client-psychiatric mental health nursing specialist privilege); CJ § 9–110 (client-accountant privilege); CJ § 9–111 (priest-penitent privilege); CJ § 9–112 (newspaper person-news source privileged); and CJ § 9–121 (social worker-client privilege). Certain common-law rules also prevent the discovery or use at trial of certain matters. *Hamilton v. Verdow*, 287 Md. 544, 562, 414 A.2d 914, 924 (1980)( "The executive privilege concept has been considered part of the common law of evidence."). Respondents have asserted no privilege pertaining to the amounts of the settlement agreements they negotiated with other potentially responsible parties.

We next must address whether, as set forth in Rule 2–402(a), the information sought by petitioners was relevant. Although the amounts of the negotiated settlements may have been irrelevant in the pre-trial stage, once the verdicts were rendered against petitioners, the amounts of the settlement agreements became relevant in determining the apportionment of damages as to petitioners under the Maryland Uniform Contribution Among Joint Tort-Feasors Act.

Courts outside of Maryland have had the opportunity to address the issue of whether settlement agreements, deemed confidential by the parties that negotiated them, are discoverable. In a case involving the Rhode Island Uniform Contribu-

tion Among Joint Tort–Feasors Act,[3] the United States District Court for the District of Rhode Island examined whether a nonsettling defendant could compel disclosure of a settlement agreement negotiated between the plaintiffs and a former codefendant. The plaintiffs in that case had brought a malpractice suit against a group of physicians and a hospital. The plaintiffs and the former codefendant physicians, who previously had settled with each other, argued the documents were not discoverable by the codefendant hospital because secrecy provisions of the agreement prevented disclosure, the defendant hospital did not show a need for the agreement, and the disclosure of the agreement would inhibit future settlements.

After noting that Rule 26(b) of the Federal Rules of Civil Procedure was broad and permitted discovery of information if relevant and not privileged, the court examined the relevancy of the settlement agreement. In concluding the agreement was relevant, the court reasoned: "[U]nder the Rhode Island version of the Uniform Contribution Among Joint Tortfeasors Act, . . . the damages which the plaintiffs can collect from the Hospital if they successfully prosecute what remains of the case will depend to some extent on the terms, amount, and value of the Physicians' settlement." *Bennett v. La Pere,* 112 F.R.D. 136, 138 (D.R.I.1986) (citations omitted). The court also concluded there were no other considerations that would militate against the disclosure.

Another case discussing whether amounts of settlement agreements are discoverable is *Bottaro v. Hatton Associates,* 96 F.R.D. 158 (E.D.N.Y.1982). In *Bottaro,* a case concerning securities law violations, one of the defendants negotiated with the plaintiffs a settlement agreement, which stipulated that its terms would not be disclosed. After the settling defendant was dismissed from the action, the two remaining defendants sought to obtain pretrial disclosure of the agreement. They

---

**3.** Like Maryland, Rhode Island has adopted a modified version of the 1939 Model Uniform Contribution Among Joint Tort–Feasors Act. *See* 12 U.L.A. 189 (1996).

argued the settlement agreement was relevant in determining whether the settling defendant was liable to them for contribution. Holding the settlement agreement was not relevant at the pretrial stage, the court stated:

> While it is true that a settling defendant's liability for contribution depends on whether he paid his share of any damage award, this determination cannot be made until a final judgment has been rendered. Only at that juncture will the full liability of all defendants be known, and the pro rata share owed by the settling party ascertained. Even then, the settlement would not be evidence relevant to any issue in this case other than the ministerial apportionment of damages, a mathematical computation which the Court rather than the jury will perform. Hence, the amount of the settlement is not relevant to any issue in this case at this time.

*Id.* at 160 (citations omitted).

Other federal courts examining the discoverability of settlement agreements concluded settlement agreements were discoverable if they were relevant. *See Young v. State Farm Mut. Auto. Ins. Co.,* 169 F.R.D. 72, 79 (S.D.W.Va.1996) (holding settlement agreement between client and insurance company that resulted from an unlawful trade practices suit was discoverable in an action by client's former attorney for fees in a tort action because it was relevant to the nature of the agreement between client and attorney and the results obtained in the tort action); *Doe v. Methacton Sch. Dist.,* 164 F.R.D. 175, 176 (E.D.Pa.1995) (recognizing discoverability of settlement agreements but declining to allow discovery because agreement was not relevant); *Vardon Golf Co. v. BBMG Golf Ltd.,* 156 F.R.D. 641, 650–51 (N.D.Ill.1994) (recognizing settlement agreements were discoverable so long as they were relevant but declining to compel disclosure of agreement because defendant did not show it was relevant); *Lesal Interiors, Inc. v. Resolution Trust Corp.,* 153 F.R.D. 552, 563–64 (D.N.J.1994) (recognizing discoverability of settlement agreements but declining to compel disclosure where party seeking it did not make a particularized showing that material sought

was relevant or likely to lead to admissible evidence); *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti,* 148 F.R.D. 532, 534 (E.D.Pa.1993) (holding party was entitled to discovery of settlement agreement); *Morse/Diesel Inc. v. Trinity Indus.,* 142 F.R.D. 80, 85 (S.D.N.Y.1992) (holding magistrate judge erred in ordering production of settlement agreements where judge did not determine whether the documents were reasonably calculated to lead to the discovery of admissible evidence); *Morse/Diesel, Inc. v. Fidelity & Dep. Co.,* 122 F.R.D. 447, 450–51 (S.D.N.Y.1988) (holding settlement agreements were discoverable because they were relevant to issues of construction costs).[4] Some federal courts have recognized impliedly the admissibility of settlement agreements. *See Lafarge Corp. v. Hartford Casualty Ins. Co.,* 61 F.3d 389, 400–01 (5th Cir.1995); *Haworth, Inc. v. Herman Miller, Inc.,* 998 F.2d 975 (Fed.Cir.1993).

State courts also have held that settlement agreements, deemed confidential by the parties who negotiated them, are discoverable. *See Council of Unit Owners of Sea Colony East v. Carl M. Freeman Assocs.,* C.A. 86C–AU–52, 1990 WL 128185, at *3 (Del.Super.Ct.1990) (holding a portion of settlement agreement was discoverable but prohibiting discovery of the remaining portion because it was not relevant); *Perez v. State Indus., Inc.,* 578 So.2d 1018, 1020 (La.Ct.App.1991) (holding settlement agreement was discoverable and could be used to show bias despite rule prohibiting the introduction of settlement agreements to prove liability); *Page v. Guidry,* 506 So.2d 854, 857–58 (La.Ct.App.1987) (holding settlement agree-

---

4. The federal courts examining the discoverability of settlement agreements are split on the requisite showing needed to obtain discovery of these documents. Some courts require the party seeking discovery of settlement agreements to make a "particularized showing" that inspection of settlement agreements will lead to admissible evidence. *Compare Young,* 169 F.R.D. at 79; *Lesal,* 153 F.R.D. at 562; *Morse/Diesel,* 122 F.R.D. at 451; *Bottaro,* 96 F.R.D. at 160 (requiring "particularized showing") with *Bennett,* 112 F.R.D. at 139–40 (rejecting "particularized showing" standard). We have articulated, in prior cases, a workable standard when a party seeks discovery of confidential information. *Zaal v. State,* 326 Md. 54, 602 A.2d 1247 (1992); *Baltimore City Dep't of Social Services v. Stein,* 328 Md. 1, 612 A.2d 880 (1992).

ments were discoverable where the agreements were not admitted to establish liability but were admitted to apportion damages and assess the plaintiff's credibility and veracity); *Corn Exch. Bank v. Tri–State Livestock Auction Co.,* 368 N.W.2d 596, 599 (S.D.1985) (stating "[a]ny agreement between some, but not all, of the litigants should be disclosed upon the request of any party in accordance with our rules of procedure"); *Ford Motor Co. v. Leggat,* 904 S.W.2d 643, 649 (Tex.1995) (stating "[s]ettlement agreements are discoverable to the extent they are relevant" (citation omitted)); *Collier Servs. Corp. v. Salinas,* 812 S.W.2d 372, 377 (Tex.Ct.App.1991) (holding settlement agreement was discoverable because it was relevant to a judgment creditor's search for assets from which to collect its judgment); *Slusher v. Ospital,* 777 P.2d 437, 444 (Utah 1989) (holding "where an injured plaintiff and one or more, but not all, defendant tort-feasors enter into a settlement agreement, the parties must promptly inform the court and the other parties to the action of the existence of the agreement and of its terms"). *Cf. Arkansas Best Corp. v. General Elec. Capital Corp.,* 317 Ark. 238, 246–47, 878 S.W.2d 708, 712 (1994) (holding that when parties enter into a court-approved settlement agreement, the public may access the information contained in the settlement agreement); *Scott v. Nelson,* 697 So.2d 1300, 1301 (Fla.Dist.Ct.App.1997) (holding settlement agreement in another case between defendant and an individual that contained a confidentiality provision prohibiting the individual or her attorneys from responding to any inquiry of any kind could not be used to bar the deposition of the individual). *But see In re N.Y. County Data Entry Worker Prod. Liab. Litig.,* 162 Misc.2d 263, 268, 616 N.Y.S.2d 424, 428 (Sup.Ct.1994) (holding "compelling need for privacy articulated by the plaintiffs outweighs the reasons stated by defendants for discovery of the settlement agreements"), *aff'd,* 222 A.D.2d 381, 635 N.Y.S.2d 641 (1995). When settlement agreements termed "Mary Carter" [5] agreements are involved,

---

**5.** "Mary Carter" settlement agreements contain three basic features:

some state courts require disclosure of the agreement to the nonsettling parties and the court and permit disclosure to the jury. *See Mustang Equip., Inc. v. Welch,* 115 Ariz. 206, 211, 564 P.2d 895, 900 (1977); *Kuhns v. Fenton,* 288 So.2d 253, 253–54 (Fla.1973); *Cox v. Kelsey–Hayes Co.,* 594 P.2d 354, 359–60 (Okla.1978).

■ Given the broad scope and purpose of Maryland's discovery rules, the relevancy of the amounts of the settlements to the damages petitioners were required to pay, the fact that the settlement agreements are not privileged, and the persuasive authority from other jurisdictions, we conclude that the relevant portions of such settlement agreements are discoverable.

We recognize the importance of maintaining the confidentiality of settlement negotiations. For example, Maryland Rule 5–408 prevents the admission of compromises or offers to compromise to prove the amount or validity of a civil claim. We also recognize that protecting confidentiality of negotiations encourages parties to enter into settlement agreements. We have stated on numerous occasions that the policy of this State is to encourage parties to negotiate compromises or

---

(1) The agreeing defendant is to remain a party and is to defend himself in court. However, his liability is limited by the agreement. In some instances this will call for increased liability on the part of other co-defendants. (2) The agreement is secret. (3) The agreeing defendant guarantees to the plaintiff that he will receive a certain amount, notwithstanding the fact that he may not recover a judgment against the agreeing defendant or that the verdict may be less than that specified in the agreement.

*General Motors Corp. v. Lahocki,* 286 Md. 714, 720, 410 A.2d 1039, 1042 (1980).

In *Lahocki,* we did not have the opportunity to address the discoverability of settlement agreements generally. The trial court in that case entered a pretrial order requiring the disclosure of all settlement agreements. The plaintiff and one of the defendants entered into an agreement having the three basic features of a "Mary Carter" agreement. This agreement, however, was not disclosed to the other party. We held the agreement was a settlement agreement that, by the terms of the pretrial order, had to be disclosed to the parties. It was unnecessary for us to pass upon whether the agreement was a "Mary Carter" agreement or whether the agreement was, absent a court order, discoverable.

settlements of law suits. *See Lahocki,* 286 Md. at 726, 410 A.2d at 1045; *Chertkof v. Harry C. Weiskittel Co.,* 251 Md. 544, 550, 248 A.2d 373, 377 (1968), *cert. denied,* 394 U.S. 974, 89 S.Ct. 1467, 22 L.Ed.2d 754 (1969).

The Maryland discovery rules contain provisions designed to afford protection against disclosure of sensitive information, such as information that may be contained in settlement agreements, under appropriate circumstances. Maryland Rule 2–403 gives the trial court authority to enter a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The court may enter an order requiring "that certain matters not be inquired into or that the scope of the discovery be limited to certain matters" or "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Md. Rule 2–403.

Although this Court has not examined the specific issue of whether a party may examine confidential settlement agreements, we have discussed a party's ability to inspect other information deemed confidential where the confidentiality is created by statute. For example, in *Zaal v. State,* 326 Md. 54, 602 A.2d 1247 (1992), we addressed whether a criminal defendant could inspect the confidential school records of a child he allegedly had abused. In that case, the defendant subpoenaed the victim's school records, which are confidential pursuant to Maryland regulations. The school board responded by moving for a protective order. During the hearing on that motion, the defendant argued the information in the records could contain information revealing a pattern of conduct affecting the victim's credibility. The trial court, following an *in camera* inspection of the records, quashed the subpoena, denying the defendant access to the records.

In our opinion, we set forth the appropriate standards and procedures to be utilized when a criminal defendant attempts to obtain discovery of confidential information. We stated the defendant seeking the information must first show a "need to

inspect" the confidential information. We described this "need to inspect" as a "reasonable possibility that review of the records would result in discovery of usable evidence." *Id.* at 81, 602 A.2d at 1260. In determining whether the defendant has met the need-to-inspect showing, the court may consider the nature of the charges and the issue before the court. Once the defendant meets the need-to-inspect showing, "the court may elect to review the records alone, to conduct the review in the presence of counsel, or to permit review by counsel alone, as officers of the court, subject to such restrictions as the court requires to protect the records' confidentiality." *Id.* at 87, 602 A.2d at 1264.

We applied the *Zaal* procedure to a civil case in *Baltimore City Dept. of Social Servs. v. Stein,* 328 Md. 1, 612 A.2d 880 (1992). In that case Stein, a defendant in a negligence action, sought to obtain all of the records of the Baltimore City Department of Social Services (BCDSS) relating to the plaintiffs. Under Maryland Code (1957, 1991 Repl.Vol.), Art. 88A, § 6, however, the records were confidential. The BCDSS filed a Motion for a Protective Order, and Stein moved to compel production of the documents. The trial court denied the BCDSS's request for a protective order and granted Stein's motion to compel.

In our opinion, after noting that the records sought by Stein, by statute, were confidential, we cited extensively to the standards and procedures outlined in *Zaal* and adopted that same approach for civil cases. We went on to emphasize, however, that even when a party seeking disclosure has shown a need to inspect, "there should be no greater disclosure allowed than is necessary to meet the 'need to inspect' shown by" the party seeking inspection. *Stein,* 328 Md. at 31, 612 A.2d at 894. There certainly would be no greater standard, and there may be significantly less of a standard, where there is no statutory basis for the claims of confidentiality, as in this case.

Petitioners had a "need to inspect" so much of the settlement agreement as was relevant to a determination of wheth-

er, and how much, the judgments against them might be affected by (1) the way in which the agreement classified the settling defendant, *i.e.*, tortfeasor or nontort-feasor, (2) whether a pro tanto or pro rata release was intended, and (3) the amount paid for the release. Petitioners demonstrated more than " 'a reasonable possibility that review of the [settlement agreements] would result in discovery of usable evidence.' " *Id.* at 27, 612 A.2d at 893; *Zaal,* 326 Md. at 81, 602 A.2d at 1260.[6] The amounts of the settlement agreements in the instant case *in fact were utilized* by the trial court to determine the amounts of the final judgments entered against each petitioner. This "evidence," however, was completely withheld from petitioners. We hold that such a procedure was inappropriate.

Accordingly, we vacate the trial judge's apportionment of damages against the respective petitioners and remand for further proceedings consistent with this opinion. While we hold complete *nondisclosure* of the settlement agreements was inappropriate, the *complete disclosure* of negotiations leading up to the settlement agreements likewise, depending on the circumstances upon remand, might also be inappropriate. The sums and certain of the conditions of the settlements, however, are relevant and discoverable in the context of this proceeding.

### III. THE DEFAULT JUDGMENT

Although the trial court entered a default judgment against B & W, it refused to reduce the judgment against Porter Hayden pursuant to the Maryland Uniform Contribution Among Joint Tort–Feasors Act (the Act). Under the Act, a nonsettling joint tort-feasor is entitled to a reduction on a

---

**6.** We recognize that the standards and procedures established in *Zaal* and applied in *Stein* were utilized in those cases during the pretrial stage. Although in this case petitioners sought to inspect the confidential information after the jury rendered its verdict but before final judgments were entered, we discern no reason why such a procedure could not be utilized in the present context.

claim against it when the plaintiff has entered into a release with a joint tort-feasor. The Act provides:

> A release by the injured person of one joint tort-feasor ... does not discharge the other tort-feasors ... but it reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

CJ § 3–1404. The term joint tort-feasors is defined in the Act as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." CJ § 3–1401(c). With respect to the method by which one may be considered a joint tort-feasor under the Act, this Court in *Swigert v. Welk*, 213 Md. 613, 619, 133 A.2d 428, 431 (1957), stated: "The act does not specify the test of liability. Clearly, something short of an actual judgment will suffice; we think it equally clear that a denial of liability will not."

When a judge or a jury determines a releasee is liable for an injury to the plaintiff, the releasee, by way of that judicial determination of liability, becomes a joint tort-feasor, and section 3–1404 of the Courts and Judicial Proceedings Article operates to reduce the claim against the nonsettling joint tort-feasor. *See Brooks v. Daley*, 242 Md. 185, 193, 218 A.2d 184, 188 (1966); *see also Collier v. Eagle–Picher Indus., Inc.*, 86 Md.App. 38, 58–59, 585 A.2d 256, 266–67 (holding a nonsettling defendant was entitled to a partial reduction in the verdict when a joint release was executed and only one of the settling defendants was found liable for injury to plaintiff), *cert. denied sub nom. Corhart Refractories Co. v. Collier*, 323 Md. 33, 591 A.2d 249 (1991).

On the other hand, when there is a judicial determination by either a judge or jury that the releasee is not liable, the releasee is not considered a joint tort-feasor, and section 3–1404 does not apply to reduce the plaintiff's claim against the nonsettling joint tort-feasor. *See Owens–Corning Fiberg-*

las Corp. v. Garrett, 343 Md. 500, 530–33, 682 A.2d 1143, 1159 (1996) (holding that a jury determination that releasees were not liable and therefore not joint tort-feasors precluded right of contribution); Allgood v. Mueller, 307 Md. 350, 357, 513 A.2d 915, 919 (1986) (stating that a jury determination that releasees were not liable precluded reduction of verdict against nonsettling defendant); Brooks, 242 Md. at 193, 218 A.2d at 188–89 (stating that the nonsettling defendant was not entitled to a reduction in the verdict because jury determined releasee was not liable); Collier, 86 Md.App. at 58–59, 585 A.2d at 265–66 (1991) (concluding that when a settling defendant is not liable, the nonsettling defendant is not entitled to a reduction in the verdict); C & K Lord, Inc. v. Carter, 74 Md.App. 68, 73–74, 536 A.2d 699, 701–02 (1988) (holding that when settling defendants were granted summary judgment because they were immune from suit, the nonsettling defendant was not entitled to a reduction in the verdict).

A trial on the merits and subsequent determination by a fact finder that a settling defendant is a joint tort-feasor is not the sole method by which a nonsettling defendant may obtain a reduction in the verdict pursuant to section 3–1404. The release between the plaintiff and the settling defendant may provide that the settling defendant is, or is to be considered, a joint tort-feasor, in which case the nonsettling defendant is entitled to a reduction in the verdict. See Martinez v. Lopez, 300 Md. 91, 94–95, 476 A.2d 197, 198–99 (1984); Jones v. Hurst, 54 Md.App. 607, 611–12, 459 A.2d 219, 222 (1983).

In this case, there has been no determination by a fact finder as to B & W's liability. Likewise, the release apparently did not provide that B & W was to be treated as a joint tort-feasor for purposes of the Act. The issue is whether the default judgment on Porter Hayden's third-party claim entered against B & W constituted a determination of liability such that B & W should be considered a joint tort-feasor for purposes of section 3–1404 of the Courts and Judicial Proceedings Article.

We recently described the effect of a default judgment in *Curry v. Hillcrest Clinic, Inc.*, 337 Md. 412, 434–36, 653 A.2d 934, 945 (1995), where we stated:

> In Maryland a default judgment is considered more akin to an admission of liability than to a punitive sanction. In *Hopkins v. Easton Nat'l Bank*, 171 Md. 130, 134, 187 A. 874, 876 (1936), this Court said that a default results in "the tacit admission by the defendant in default of the truth of the allegations of the bill of complaint as they are averred." In *Pacific Mortgage & Inv. Group, Ltd. v. Horn*, 100 Md.App. 311, 332, 641 A.2d 913, 923 (1994), the Court of Special Appeals stated that "[a] judgment by default constitutes an admission by the defaulting party of its liability for the causes of action set out in the complaint." And finally, in *Gotham Hotels, Ltd. v. Owl Club, Inc.*, 26 Md.App. 158, 173, 337 A.2d 117, 125 (1975), the court held that "failure to plead ... constituted an admission ... of liability for the cause of action set forth in the declaration."

*See also Associated Transp. v. Bonoumo*, 191 Md. 442, 445–46, 62 A.2d 281, 283 (1948) ("[A] judgment by default is as binding as any other judgment and establishes the liability of the defendant to the plaintiff. . . .").

*Curry* stands for the proposition that a default judgment should be treated as an admission of liability. The question then is whether this admission of liability is sufficient to establish B & W a joint tort-feasor. As we stated, *supra,* we noted in *Swigert* that "[c]learly, something short of an actual judgment will suffice." 213 Md. at 619, 133 A.2d at 431. Although no determination as to B & W's liability was made by a judge or a jury, B & W's admission of liability, resulting from the entry of default judgment, is sufficient to establish it as a joint tort-feasor under the Act.

We find further support for our conclusion from the case of *Montgomery County v. Valk Manufacturing Co.*, 317 Md. 185, 562 A.2d 1246 (1989). With respect to third-party practice in actions involving the Uniform Contribution Among Joint Tort–Feasors Act, we stated:

Now third party practice in contribution cases is regulated by Maryland Rule 2–332, formerly Md. Rule 315. The goals of the procedural device, however, remain the same. "The purpose of the third party practice provided for by the [UCATA] and by the Rules which have superseded it [is] to try in one action all phases of litigation among the original and impleaded parties...."

*Id.* at 191, 562 A.2d. at 1249 (quoting *Stem v. Nello L. Teer Co.,* 213 Md. 132, 144, 130 A.2d 769, 775 (1957)) (footnote omitted)(brackets in original).

If we were to hold that the trial court could enter a final judgment against Porter Hayden without recognizing the default judgment entered against B & W, the issue of what damages are due to Porter Hayden from B & W would be unresolved. This would defeat one of the main purposes of the Maryland Rules and the Act—to try in one action all phases of the litigation.

Accordingly, the Court of Special Appeals erred in determining "it was not established that B & W was a joint tort-feasor." *Grimshaw,* 115 Md.App. at 185, 692 A.2d at 30. Likewise, the trial court erred in not considering what effect B & W's status as a joint tort-feasor would have in establishing the correct amount of the apportionment of the judgment against Porter Hayden in the Grimshaw case pursuant to section 3–1404 of the Courts and Judicial Proceedings Article.

## IV. CONCLUSION

We hold the trial court erred in refusing to allow petitioners to inspect the amounts of the settlement agreements in order to calculate the amounts of the verdicts to be entered against them and, accordingly, we vacate the trial court's apportionment of the damages between the defendants below. Due to the resolution of this issue, it is unnecessary for us to resolve the first issue presented by petitioners. As we have indicated, it will be necessary for the trial court to address it on remand.

We also hold the trial court and Court of Special Appeals erred in not treating B & W as a joint tort-feasor. A default judgment against a settling defendant is akin to an

admission of liability. Such an admission of liability is sufficient to establish one a joint tort-feasor for the purposes of the application of section 3–1404 of the Courts and Judicial Proceedings Article.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AS TO APPORTIONMENT OF DAMAGES AND APPLICATION OF THE UNIFORM CONTRIBUTION AMONG JOINT TORT–FEASORS ACT VACATED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO VACATE THE JUDGMENT AS TO APPORTIONMENT OF DAMAGES OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.

RODOWSKY, Judge, concurring and dissenting.

I join in Parts I and II of the Court's opinion. I respectfully dissent from the holding in Part III of the Court's opinion that the effect of the entry of a default judgment for contribution against Babcock & Wilcox Co. (B & W) on the third-party claim of Porter Hayden Company (PH) was to reduce the amount of the judgment payable to the plaintiff by the nonsettling defendants. The Court does not consider the terms of the release between B & W and John M. Grimshaw (Grimshaw). Grimshaw represents, and the Court of Special Appeals treated as a fact, that the Grimshaw–B & W release provided that "in order for [PH] to be entitled to a decrease or pro rata reduction of the damages claimed by Grimshaw, it must be adjudicated that the releasees are joint tort-feasors." *Anchor Packing Co. v. Grimshaw,* 115 Md.App. 134, 183, 692 A.2d 5, 30 (1997). As explained below, the default should not be determined to adjudicate B & W as a joint tort-feasor, *vis-a-vis,* and to the detriment of, Grimshaw.[1]

---

1. Grimshaw's action was consolidated with other cases. Although no part of the Grimshaw–B & W release appears in the record extract, the

It appears that Grimshaw and B & W settled before Grimshaw filed suit against PH and others. PH impleaded B & W as a third-party defendant, claiming contribution. B & W neither answered the third-party complaint nor responded to discovery requests submitted by PH. On August 30, 1995, the circuit court filed, and the clerk docketed, the following order:

"ORDERED that Judgment by Default, pursuant to Maryland Rule 2–433(a)(3) be and the same is hereby entered in favor of [PH], Third–Party Plaintiff, against [B & W], Third Party Claims for contribution filed against [B & W] herein."

Maryland Rule 2–433(a)(3) (1998 Repl.Vol.) provides that

"the [circuit court], if it finds a failure of discovery, may enter such orders in regard to the failure as are just, including . . ..

. . . .

". . . [a]n order . . . entering a judgment by default that includes a determination as to liability and all relief sought by the moving party against the failing party. . . . If, in order to enable the court to enter default judgment, it is necessary to take an account or to determine the amount of

---

critical language from releases negotiated by B & W with other plaintiffs in the consolidation does appear in their memorandum supporting a motion to vacate the default in favor of PH against B & W. That provision reads:

"7. It is further agreed and understood by the parties hereto that any other person or organization whom we claim are liable to us for our injuries, losses and damages should not be entitled to a satisfaction or reduction or pro rata reductions of the damages we are claiming against them by reason of the payment herein, unless it is adjudicated that Releasees are joint tortfeasors with said other person or organization. In the event that Releasees or any of them are adjudicated to be joint tortfeasors, then the payment herein shall constitute a reduction to the extent of either the dollar amount of the payment or the pro rata share of liability of any such Releasees, whichever is greater, for the damage recoverable by us from other joint tortfeasors. This release is expressly intended and shall be construed to release Releasees for all claims of contribution pursuant to the Uniform Contribution Among Tortfeasors Act."

Because the cases before us will be remanded, under Part II of the Court's opinion for the purpose of reviewing the actual releases, this Court should give the Circuit Court for Baltimore City guidance in that undertaking.

damages ... the court may rely on affidavits, conduct hearings or order references as appropriate, and, if requested, shall preserve to the plaintiff the right of trial by jury."

Other plaintiffs in the consolidated cases sought to vacate the above order, but the cases went to trial without the court's ruling on their motion.

The consolidated cases were submitted to the jury on special interrogatories. Grimshaw's claims went to the jury against four defendants, three of whom, including PH, were found to be liable. At the suggestion of PH, the court simply batched the cross-claim and third-party claim defendants, without regard to which of the defendants claimed against them. Describing the cross-claim and third-party claim defendants simply as "listed parties," the court submitted their names to the jury on issues designed to determine which of them were joint tort-feasors.[2] Ten listed parties were included in those special interrogatories, most of whom were entities that had settled with Grimshaw.[3] B & W was not one of the listed parties. The jury returned a verdict in favor of Grimshaw for $1.1 million. The jury also found that each listed party was liable, but the circuit court later revised the judgment to eliminate one of the listed parties.

---

**2.** The issues submitted to the jury concerning the cross-claim and third-party claim defendants, referred to in the special issues as the "listed parties," were as follows:

"Do you find that [it has been] proven by a preponderance of the evidence that John Grimshaw's exposure to the products manufactured, supplied, installed and/or distributed by the listed parties was a substantial contributing factor in the development of his mesothelioma?

"Do you find that it has been proven by a preponderance of the evidence that any of the listed parties were negligent in manufacturing, supplying, installing, and/or distributing asbestos-containing products to which Mr. Grimshaw was exposed?

"Do you find that it has been proven by a preponderance of the evidence that the listed parties manufactured, supplied, installed, and/or distributed asbestos-containing products which reached Mr. Grimshaw in defective condition unreasonably dangerous to him?"

**3.** This procedure illustrates one way in which "the test of [joint tort-feasor] liability" may be "something short of an actual judgment." *Swigert v. Welk*, 213 Md. 613, 619, 133 A.2d 428, 431 (1957).

The circuit court ultimately entered a final judgment, docketed April 17, 1996, against PH and two other defendants, jointly and severally, in the amount of $170,357.14.[4]

Grimshaw's position is that the verdict should not be reduced based on his settlement with B & W. Grimshaw relies on the well-established proposition that, absent a contractual provision to the contrary, the amount paid by a settling defendant under the type of release apparently involved here is treated under the Uniform Contribution Among Joint Tortfeasors Act (the Act) as a voluntary payment if the payor is not adjudicated as a joint tort-feasor. *Allgood v. Mueller*, 307 Md. 350, 357 & n. 2, 513 A.2d 915, 919 & n. 2 (1986); *Brooks v. Daley*, 242 Md. 185, 193, 218 A.2d 184, 188 (1966); *Swigert v. Welk*, 213 Md. 613, 619, 133 A.2d 428, 431 (1957); *Collier v. Eagle–Picher Indus., Inc.*, 86 Md.App. 38, 56, 585 A.2d 256, 265 (1991). After his settlement with B & W, Grimshaw's interest was in having no adjudication that B & W was a joint tort-feasor. Having given a release to B & W, Grimshaw could not sue B & W as an original defendant; nor could Grimshaw be expected to allege or undertake to prove that a nonparty, B & W, acted tortiously toward Grimshaw. In the instant matter the Court of Special Appeals, correctly in my view, emphasized the interest that Grimshaw had in avoiding an adjudication of joint tort-feasor liability on the part of B & W. Because of an interest such as this, it has been held that a trial court erred in excluding a plaintiff from participating in post-trial proceedings in which the court was determining the joint tort-feasor status of settling defendants. *Collier*, 86 Md.App. at 57–58, 585 A.2d at 265–66.

---

**4.** The docket entries of April 17, 1996, prior to entry of the final judgment, include an order dated April 15, 1996, that in terms revises an earlier judgment entered March 11, 1996, in order "to account for the default order entered on August 30, 1995 against [B & W] in favor of [PH]." Whatever the intent of the quoted order might have been, it is clear that the final judgment did not consider B & W to be a joint tort-feasor. The April 17, 1996 judgment identifies the joint tort-feasors whose settlements were taken into account as credits against the verdict, and that enumeration does not include B & W.

B & W's interest was in enjoying the peace that it had bought. It had no concerns of liability to Grimshaw. B & W apparently believed that it had little or no exposure for contribution to any settling or nonsettling tort-feasor since any adjudication that B & W was a joint tort-feasor at least would credit B & W with having paid its pro rata share. B & W's concern seems to have been in saving the expense of litigation, as evidenced by its lack of response to PH's third-party complaint and to PH's request for discovery. But it appears that the release negotiated by B & W, a so-called *Swigert* release, did not require Grimshaw, as a matter of contract, to credit against a judgment in favor of Grimshaw the greater of the amount paid by B & W or a pro rata share, even if B & W were not adjudicated as a joint tort-feasor.

PH, on the other hand, was interested in demonstrating that B & W was a joint tort-feasor, and PH's requested discovery from B & W properly would have been directed to that issue. Further, a party in the position of PH would not necessarily know that the plaintiff had settled with an entity that was not joined as an original defendant, and PH represents to us that it learned of the existence of a Grimshaw–B & W release when PH moved for default against B & W.

Although PH may never have seen the terms of the Grimshaw–B & W release, I would hold (and the majority of the Court does not seem to disagree) that the obligation was on PH to obtain an adjudication that B & W was a joint tort-feasor in order for PH to have the verdict in favor of Grimshaw reduced under the Act by the B & W settlement. Not only was PH the third-party plaintiff, but PH has a greater interest in obtaining the adjudication than does B & W, while the plaintiff under the *Swigert* release apparently involved here has no interest in proving the payor's liability as a joint tort-feasor.

The issue then resolves into whether the default entered as a discovery sanction satisfies the Act and the release. I agree with the majority that a default in answering a complaint operates as an admission, by and against the defendant in

default, of the well-pleaded allegations of the complaint. *See Curry v. Hillcrest Clinic, Inc.*, 337 Md. 412, 434, 653 A.2d 934, 945 (1995). I also assume that the discovery sanction of default operates in that same fashion against the party failing to provide discovery. Here, however, PH seeks to have B & W's discovery default treated as legally conclusive against Grimshaw. PH, in effect, takes the position that the default by B & W operates as claim or issue preclusion against Grimshaw on B & W's joint tort-feasor status. I do not believe that the sanction imposed on B & W, without opposition by B & W, can *automatically* operate as an adjudication detrimental to Grimshaw.

The framework for analyzing these issues is found in the opinion after reargument in *Keitz v. National Paving & Contracting Co.*, 214 Md. 479, 134 A.2d 296, *on reargument*, 214 Md. 479, 136 A.2d 229 (1957). In that motor tort case the operator of vehicle No. 1 sued the operator of vehicle No. 2, the latter's general employer, and the corporation that had hired the use of vehicle No. 2 and its driver.[5] At the close of the plaintiff's case the trial court granted a directed verdict in favor of the hirer. The trial proceeded, resulting in judgments in favor of the plaintiff against the adverse driver and his general employer. On the plaintiff's appeal, the Court vacated the judgment in favor of the hirer on the issue of agency and ordered a new trial. The Court then addressed the plaintiff's contention that, at the retrial after remand, the hirer would be bound by the finding of negligence on the part of the driver and bound by the damages awarded by the jury.

To determine the effect of the judgment against the servant in subsequent proceedings against the hirer, this Court looked to the law of claim and issue preclusion. The Court reasoned that, if the driver of vehicle No. 2 was the servant of both the general employer and the hirer, the latter two would be joint tort-feasors and entitled to contribution at common law, as non-active wrongdoers, and under the Act. *Keitz*, 214 Md. at

---

**5.** The manager of the general employer was also joined as a defendant, but that aspect of *Keitz* is irrelevant to the present discussion.

497–98, 136 A.2d at 231. Relying on the Restatements of Judgments and of Restitution, on Freeman on Judgments, and on the law of "vouching in," the Court analogized to the rule "that one liable over in tort as indemnitor or contributor is concluded as to the right of the injured person to recover and the amount of damages, by a judgment against the indemnitee or contributee who had notified him to defend." *Id.* at 499– 500, 136 A.2d at 232 (footnote omitted).[6] Further, this Court said that the policy of the Act

> "will best be served by making the judgment against one tortfeasor conclusive as to liability and amount on the other tortfeasor, where that other participated in the case in the manner and to the extent that [the hirer] did in [*Keitz* ]."

*Id.* at 502, 136 A.2d at 234. Consequently, on retrial, the hirer was precluded from relitigating the negligence of the driver and from relitigating the plaintiff's damages.

*Keitz* differs substantially from the instant matter in at least two aspects. First, the judgment against the general employer in *Keitz* was the result of a trial, but the judgment relied upon here by PH is the result of a default. Second, the general employer and the hirer in *Keitz* were adversaries. *Id.* ("[J]oint tortfeasors, as potential indemnitees *pro tanto* with respect to each other, necessarily are adversaries."). In the action now before us Grimshaw and B & W, the party against whom judgment was entered, are not adversaries on the pleadings, and they were not adversaries in fact, inasmuch as B & W did not participate at all in the action.

Where the prior judgment is entered based on a default, the law distinguishes between claim preclusion (*res judicata*) and issue preclusion (collateral estoppel). Generally, the rule is that a default judgment will support claim and defense preclusion against the party in default, but not issue preclusion against a third party. "Judgment by default commands the full effects of claim and defense preclusion." 18 C.A. Wright, A.R. Miller & E.H. Cooper, *Federal Practice & Procedure*

---

6. This principle relied on in *Keitz* is set forth in 2 Restatement (Second) of Judgments § 57 (1982).

§ 4442, at 373 (1981) (Wright).  *See also* 18 *Moore's Federal Practice* § 131.30[3][d], at 131–106 (3d ed. 1997) (Moore) (for purposes of claim preclusion a default judgment is treated the same as any other valid final judgment). Thus, in a subsequent action between PH and B & W, B & W would be precluded from asserting that it was not liable to PH for all or a part of Grimshaw's claim against PH.

But the judgment on which PH relies was entered against B & W and not against Grimshaw. In order for Grimshaw to be bound under the law of claim preclusion by the judgment against B & W, Grimshaw must be in privity with B & W. From the time PH impleaded B & W, through the entry of the default, and to final judgment in the action, the relationship between Grimshaw and B & W was that of releasor and releasee. PH has cited no authority, and we have found none, holding that that relationship is one of privity for claim preclusion purposes. I would hold that it is not. The releasor-releasee relationship is too attenuated in relation to traditional privity, and applying claim preclusion to it could create incalculable mischief. *Compare Small v. Ciao Stables, Inc.,* 289 Md. 554, 425 A.2d 1030 (1981) (Under the agency relationship there involved, principal was in privity with agent for determining preclusive effects of New York judgment against agent).

Where, as here, there has been no determination of underlying facts in connection with the entry of a default, the legal conclusion that issue preclusion does not arise is supported by both Wright and Moore. The authors of Wright present the following analysis:

"Issue preclusion has enjoyed a changing relationship to default judgments. Some courts still adhere to a rule that judgment by default establishes issue preclusion as to every issue that would have to be resolved to support the same judgment after trial on the merits. This rule has been criticized vigorously on two related grounds that focus on default by failure to answer. First, it is pointed out that the essential foundations of issue preclusion are lacking for want of actual litigation or actual decision of anything.

Second, it is urged that a defendant may suffer a default for many valid reasons other than the merits of the plaintiff's claim. In line with this criticism, many federal cases have ruled in various circumstances that default judgments do not support issue preclusion. This result is correct for the reasons given as to judgments that are entered without further inquiry upon failure to answer."

Wright § 4442, at 374–76 (footnotes omitted). *See also* Moore § 132.03[2][k], at 132–90 (A default judgment would not ordinarily support issue preclusion because the issues have not actually been litigated.).

An illustrative decision is *Nichols v. Anderson,* 788 F.2d 1140 (5th Cir.1986). There a person who had been injured in an automobile accident filed suit in Mississippi against two defendants, one of whom was insured under a policy containing an exclusion that limited coverage to within a 150 mile radius of McCory, Arkansas. While the Mississippi action was pending, the insurer filed an action in Arkansas against the insured and obtained a declaratory judgment that there was no duty to defend and no coverage, all based upon the default of the insured to respond to the Arkansas suit. After the injured party had obtained judgment against the insured in the Mississippi action, the former instituted a garnishment proceeding against the insurer. In that garnishment action the insurer contended, and the trial court agreed, that the Arkansas judgment bound the tort plaintiff, rejecting the latter's argument that Arkansas law applied and made the exclusion invalid. The Fifth Circuit reversed, holding that Arkansas law applied but that the validity of the radius exclusion had not been " 'actually litigated' in the Arkansas proceedings." *Id.* at 1142. The court specifically noted that it was not reaching the issue of whether the plaintiff-judgment holder could be considered in privity with the adverse operator/insured "for due process purposes." *Id.* at 1142 n. 1. (The exclusion was held to be invalid under Arkansas law.).

Issue preclusion based on a default in an action alleging fraud has been denied in a subsequent action in bankruptcy where the judgment debtor's discharge is opposed on the

grounds of fraud. *See, e.g., In re Raynor,* 922 F.2d 1146 (4th Cir.1991); *In re Lombard,* 739 F.2d 499 (10th Cir.1984); *Matter of McMillan,* 579 F.2d 289 (3d Cir.1978).

Judgments based upon an express admission of liability are treated similarly to default judgments for issue preclusion purposes. In the context of a judgment based upon an admission of liability to the plaintiff by a defendant-third-party plaintiff, it has been said that the judgment is not binding on a third-party defendant, or on a party who has been vouched in, as to the issue of the defendant-third-party plaintiff's liability to the plaintiff. *See Blommer Chocolate Co. v. Bongards Creameries, Inc.,* 635 F.Supp. 919, 924 (N.D.Ill.1986) ("the principle [is] that a judgment will not bind a third party defendant if liability was grounded on the defendant/third party plaintiff's admission of liability . . . .").

Phrased another way, the default judgment for contribution against B & W in favor of PH is not a judgment on an issue that was actually litigated between PH and Grimshaw, although they were adversaries. *See* Restatement (Second) of Judgments § 27 cmt. *a* ("The rule of issue preclusion is operative where the second action is between the same parties who were parties to the prior action, and who were adversaries (see § 38) with respect to the particular issue."). For all of the foregoing reasons the default judgment for contribution against B & W cannot be enforced by deducting from Grimshaw's damages the greater of (1) the consideration paid by B & W for its release or (2) a pro rata share computed by including B & W among the set of adjudicated joint tortfeasors.

Had PH sought to accomplish that result, absent B & W's discovery default, PH would have to have introduced evidence against B & W and sought a jury determination, all of which Grimshaw would have had an opportunity to oppose. But because of B & W's failure to give discovery, we do not know what evidence PH might have been able to present.

The holding of the majority treats B & W's default as an adjudication that satisfies the condition in the release. Presumably the cost to B & W of a release under which Grimshaw

unconditionally agreed to treat B & W as a joint tort-feasor would have been greater than the consideration actually paid. Thus, the majority opinion gives B & W more than it was willing to buy and bases that result on conduct within B & W's control. The majority opinion allows B & W to ignore PH's third-party claim and the associated discovery and thereby to alter Grimshaw's contractual rights.

Although the holding proposed above would resolve in favor of Grimshaw the issue of whether Grimshaw's recovery is to be reduced further, one may fairly ask, "What is the significance of the default judgment?" I would interpret the order imposing the discovery sanction to mean that B & W is liable to PH for contribution. The amount of B & W's exposure to PH may be the difference between PH's pro rata share of the common liability, determined by a set of joint tort-feasors that does not include B & W, and PH's pro rata share of the common liability, determined by a set of joint tort-feasors that includes B & W. Further, PH, by suggesting the manner in which joint tort-feasor status be submitted to the jury, may have waived any right to have a monetary judgment entered against B & W. These and related issues, however, are not before this Court at this time.